Kirkpatrick, O. J.
This is an ejectment for lands in Salem. At the trial of the cause, it was moved for a non- *8 suit by tlxe defendant’s counsel, because the lessors of the plaintiff had not shewn a title by deed or other conveyance, nor a possession iri themselves and those under whom they claimed for the term of twenty years, and the plaintiff was called accordingly.
The ground of the non-suit, as thus presented by the .counsel, • and taken by the court, is not-quite so precisely stated as could have been wished. From the manner in which it is expressed, it is left doubtful whether it was intended to say, that the lessors of the plaintiff had not shewn a possession of twenty complete years, and therefore not a sufficient one to maintain an action of ejectment, or that they had not shewn a possession xoithin twenty *years before action brought, and therefore were barred by the statute.
It will be necessary, therefore, to look into the case, and see how far the motion is supported in point of fact, upon either the one or the other of those grounds.
But before I proceed to this, I feel myself constrained, from the course which the argument at the bar has taken, rather than from anything in the case itself, to make a few observations respecting ■ the action of ejectment, as it has been used in this state, from'the earliest settlement of the country down to this time. I say, I feel myself constrained to do this from the course of the' argument; for it has been insisted, that the plaintiff in ejectment always has been, and still is obliged, in order to maintain his suit, to shew, what the counsel call, a complete, substantive, impregnable title; that is, as it has been explained, a regular deduction of title, by deed from Charles II. down to himself, or an exclusive and uninterrupted possession in himself and those under whom he claims, formerly for sixty years, then for thirty, and now for twenty, according as the successive statutes of limitation prevailed; or, in other words, such a title as might be disputed, indeed, in point of fact, but could never be overcome by one superior to it. And by way of fortify *9 iug this position, reference is made to former practice, in which it is said such deduction was uniformly made, and always required.
Ijet us examine this position a little. By the common law, estates of freehold in lands passed by livery of seisin only; that is, by a delivery over of the actual possession. He, therefore, who was in the actual possession of land, was, prima fade, the tenant of the freehold, and had in him the heritable sesina fadt stipitem. If ho were ousted or dispossessed of this freehold, by one who had no right, he might, without process of law, make a peaceable entry, or, if deterred from that, he might make claim from year to year, which was called continual claim, as near the land as he could, and such entry or claim restored him to his lawful seisin, and made him capable again of conveying, either by descent or purchase. This right of entry, though it might be tolled or taken away by a descent cast, and so, generally speaking, must be pursued during the life of him that made the ouster, or be forever lost, yet it was limited to no particular period or number of years; so that if it was not actually lost by descent or * otherwise, the lawful owner might, at all times, restore himself by entering-upon the wrongdoer, in a peaceable manner, and turning him out; but if he suffered it to be once lost, he could no longer restore himself by his own act, but must have recourse to his action at law. And, indeed, even where it was not lost, as it but seldom happened that the wrongdoer would tamely submit to be turned out without force, the owner, if his object was to gain the actual possession and enjoyment of the land, and not merely to put’ himself in a capacity to make a lawful conveyance, was generally obliged to have recourse to such action, and to call to his aid the process of the law, to restore to him that right which he could not obtain by peaceable means without it; so that, in most cases, it may be said he was put to his action, even when his right of entry was not tolled or taken away.
*10 This action might be, in the first place, by writ of entry, in which he undertook to prove his own former possession, and that the defendant, or some one under whom he held, had dispossessed him; to which the defendant might answer by denying the fact of the dispossession, or by shewing in himself an older and a better possession; and then, upon the trial, it was adjudged for him who had the clearest right, or it might be, in the second place, after the reign of Henry II. by writ of assize, which went upon the suggestion, that the demandant’s ancestor had died in possession, and that he was the next heir; and therefore directed the sheriff to inquire, by a jury, whether this were so, and, if -found for the demandant, the land was immediately restored. But still, even if the demandant prevailed in these actions, it only restored to him his former possession, it decided nothing with respect to the right of property; all that he had to shew, in order to maintain his suit, was the possession of himself or his ancestor, and this might be overcome by the defendant shewing an older and a better possession; for it never was pretended that the demandant’s must be such a possession as established the ultimate right; for this, either party might after-wards resort to his writ of right. In these possessory actions, therefore, neither the deed of feoffment, by which the estate was created, nor the actual livery of seisin upon vsuch deed were necessarily given in evidence, but the mere possession onlju And so also after the 29 Car. II., which directed that all conveyances of land should be in writing, and not otherwise, it was not necessary, upon the * same principle, to give the writing in evidence, and the reason was, that the deed of feoffment and livery of seisin thereupon, in ancient times, and the written conveyance under the statute, related to, and were evidence of, the commencement of the estate, and of the ultimate right only, which was not at all in question; but that they could be no proof of the actual and subsequent possession upon which *11 the ouster was alleged to have been committed, and which was the foundation of those possessory actions, and the only thing to be proved in them, or recovered by them. It is true that those might be given in evidence, and might greatly strengthen the proof of possession, but they were not essential to the maintenance of the action ; that depended upon the mere possession.
To these real actions for the recovery of the possession of lands, succeeded, in common use, the action of ejectment. -This was not originally devised as a remedy for injuries done to real estates, that is, to estates of freehold in lands, but as a remedy for injuries done to chattels real, such as terms for years, which were considered as mere chattel interests. But then, as one who came into a court of j ustice to complain that he had been ousted of his term, must necessarily shew that such term existed, and that the lease under which he claimed was a good and valid lease, and, of course, that the lessor had a right to make it, the title of the lessor was thereby brought into question, as fully and upon the same principles as it would have been in the real action ; so that though the action of ejectment got clear of all the intricacy and perplexity of the real action, and so became an easy and expeditious method of trying the title to land, yet it required precisely the same proof of title in substance as the real action did. For though the form of the action may have been changed, yet the great principles of right have not been changed, nor can they be without a total subversion of the whole system of property in land. In a real action, the demandant must shew his possession, his ouster, and his right to re-enter; in an ejectment, the lessor of the plaintiff must shew the very same thing; — he must shew that he has been in possession of the land; that it is now withholden from him, which is an ouster; and that he had a right to re-enter and make the lease in question. I say' he must shew those things, for the lease, entry and ouster, which are confessed are the mere form of the action, and having nothing *12 to *do with the substantial right. The title, therefore, which the lessor of the plaintiff) by the consent rule, is bound to rest upon, and which he is obliged to make out at the trial, is his right of entry, (for if he had this right, it is always confessed that he had a right to make, and did make, the lease) a right which, upon the principles of the common law, necessarily results from his having had an anterior and peaceable possession of the lands in question, and their being now withholden from him by the defendant; a right too which cannot be overcome by any subsequent possession,, unless it has been tolled or taken away in the manner before mentioned, or is restrained by the statutes of limitation.
Let us, then, look a little to the history of these statutes, and consider their nature and effect.
I have said before, that this right of entry by the common law, was unlimited, in point of time, as were also the real actions of which I have spoken. In the progress of society, however, it was found necessary to constrain men to pursue their rights within a reasonable time or to abandon them for ever, and especially so where they were to be pursued by the mere act of the party himself, without the intervention of judicial authority. Hence, after sundry other statutes, the 32 Henry VIII. which limits writs of right to sixty years ; writs of assize and entry and other possessory writs, if founded upon the possession of one’s ancestor, to fifty years; and if founded, upon one’s own possession, to thirty years., Hence, also, the 21 Jac. 1, which declares, that none shall make entry into lands but within twenty years next after his right or title shall accrue to the same. After this last statute, if the lawful owner did not make his entry, and so restore himself to his possession within the time therein prescribed, his right to do so in this extra-judicial manner was gone, but still his right to have possession of the land remained as before. The only difference in his condition was, that before he had the remedy in his own hands, and he could restore himself when he pleased ; but-that now his *13 remedy was in the hands of the law, and he must be rostox-ed, if at all, by its judicial process. But his right, in both cases, was the same, a mere possessory right, founded upon his having had the possession, and his having been turned out of it by the defendant; in both cases he was restored to his possession, and his possession only.
* But- those statutes of limitation which governed those remedies in England were not considered as extending to this country, until the act of 1727, which' declares, that all the English statutes concerning the limitation of actions, real and personal, shall be in force here.
This was a popular act, intended principally to protect settlers who had made their settlements at considerable expense and labor, under specious, though sometimes defective titles, and between whom and the proprietors, therefore, there was danger of conflicting claims. By the influence of the latter, however, as it was said, who had great sway at that day in the government, and some of whom, both then and for many years afterwards, occupied the chief seats in the courts of justice, it received a very limited construction.
It was holden, in the first place, that the action of ejectment, being neither a real nor a personal action, hut a mixed one, no statute which might be construed to limit that action, as such in England, could be extended by this act; because it extended statutes concerning the limitation of real and personal actions only, and not of mixed actions. It was holden, in like manner, that that part of the 21 Jac. 1, which limits the right of entry to twenty years, was not extended; because such entry is a mere personal act of the lawful owner, and in no sense an action either real or personal, and therefore not within the words of the extending act. They said too, and indeed of course, that as by the common law the right of entry was limited to no particular time or number of years, and as the 21 Jac. 1, so lar as it respects that right, was not extended by the act, the lawful owner might make his entry at any distance of time, except *14 as hereafter stated, and maintain his ejectment upon it; and that he was neither put to his assize nor writ of entry, nor was in any way limited by the statutes concerning them. And, so far, they seem to have proceeded upon pretty plausible grounds. But they went still farther, and said, that as those real actions had never been in use in this province* and could not conveniently be introduced, and much less the writ of right, with its four knights girt with swords; and as the entry to make a lease to try the title in ejectment was but a mere fiction, and could do no injury to him in the actual possession, therefore' an entry, merely for that purpose, might be feigned in all cases where the party had right to *the land; and that, as well, where by the strict rules of the common law the right of entry had been tolled by descent, as upon discontinuances and deforcements, where the alienees and deforciants- were in by lawful possession, and' therefore could not be disturbed by the mere entry of the party without process of law. And by this mode of construction, they opened up the way to the action of ejectment, upon every claim which was within the reach of the writ of right itself. It is upon this construction that we maintain actions of ejectment, even at this day, against such heirs, alienees, and deforciants, upon whose lawful possession entry-could not be made; an instance of which we have very lately had in this court, in the case of Den v. Robinson & Carpenter, from Salem, which was a discontinuance by tenant in tail. I speak now of the principles .of the common law only, and altogether without reference to the operation of the statute of uses, which may be said, in some sense, to have changed the whole doctrine of entries.
From this view of this extending act, and of the construcr tion given to it, with respect to those statutes, it is manifest that until our act of 1787, limiting actions of ejectment, in certain cases, to thirty years, and our present act limiting all manner of actions for lands to twenty years, we had no operative limitation, except that contained in the first sec *15 tion of the 32 Henry VIII. which says, that no person shall from thenceforth sue or maintain any writ of right upon the possession of his ancestor, unless such ancestor shall have been seized or possessed thereof, within three score years next before the teste of the writ. And, indeed, it might be supposed, at first view, that the judges of that day might have got clear, even of this, upon the same principle they got clear of the writs of assize and entry; but, upon a more careful examination, it will be found that the words of the statute are very broad ; they not only limit the writ of right, strictly speaking, but also all manner of claims founded upon possession, unless such possession has been within three score years before such claim is made. They extended this clause, therefore, and this was the whole operation which they gave to this extending act, so far as it respected actions for lands.
If I should be asked upon what authority I ground these positions respecting the construction of this act, and the extension of the English statutes of limitation, I will frankly confess that I *can refer tp no adjudged cases, no express decisions upon those very points; none such have been printed or handed down to us in authentic form that I know of. The history of our judicial proceedings in former times, so far as we can come at it at all, is to be collected only from manuscript notes, made for private use, and from oral traditions and instructions delivered to us by our predecessors, and to them by theirs; but it is authenticated not only by their authority, but which is far better, by the uniform practice of the court, as far back as memory can reach, which could not have taken place without some fixed principles to rest upon. What I have said upon this subject I have collected principally, in the first’place, from a note-book made by Mr. Philip Kearney, formerly of Perth Amboy, an industrious, pains-taking man, which was many years ago lent to me by his son, Bevaud Kearney. It purported to be notes of cases adjudged in the Supreme Court, *16 principally in the time of Chief Justice Morris, who presided in that court from about the year 1738 till 1764, and of opinions given at chambers by eminent counsel, of whom Mr. Alexander, a distinguished counsellor in those early times, seemed to be the foremost; in the second place, from the instructions and communications which I received from my-master, the late Judge Paterson, while a student in his office, and afterwards while in practice, for he was always ready to communicate; and, in the third place, from conversations which I have had with gentlemen who have been in practice before the Revolution, of whom I may mention Mr. John De Hart, of Elizabethtown, and the late Judge Morris, of New Brunswick, but especially my learned predecessor Chief Justice Kinsey, the accuracy of whose knowledge upon subjects of this kind will be disputed by none who knew him. It may be taken, therefore, I think, as an unquestionable fact, that the construction of this extending act, and the application of the English statutes of limitation, as understood and received in those times, were as. I have stated them.
The right of the lawful owner, therefore, to enter upon the wrongdoer in this extra-judicial manner, and so to restore himself to his possession and make leases, &c., from the first settlement of the province till the act of 1727, was wholly' unlimited in point of time from that time till the act of 1787 it was limited to sixty years; after that, in some cases, to thirty years ; and *since the act of 1798, in all cases, with the usual savings, to twenty years; and as this right of entry is the foundation of the action of ejectment, that action, of course, was limited in the same manner, and not otherwise. But that limitation is merely a limitation of the time within which the entry must be made, and, by no possible construction, a designation of the time during ■which the possession must have continued. Can any book case be found in which, since the 21 Jac. 1, a possession óf twenty complete years has been holden necessary to main *17 tain an ejectment? None such can be found. One comes into a court of justice, and says he has been in possession of lands for five, ten, or fifteen years, and that the defendant has turned him out, and holds him out, shall he be told he has no redress, because he has not been in twenty complete years ? and shall the defendant be justified in withholding from him his peaceable possession, thus tortiously and forcibly gained ? Suppose another should enter and turn him out, and another him, shall the last always hold ? To what would all this lead but a mere trial of strength, in defiance of law ; for it is directly in the tooth of that universally acknowledged principle, that peaceable possession itself is a title which shall never be disturbed but by one who has a better right, and which, therefore, the law will carefully protect until that right be shewn in a judicial manner. And whether that possession has lasted five years, or ten years, or twenty years, the law sees no difference. Upon what ground, then, is this notion of possession of twenty complete years founded ? Certainly the 21 Jac. 1, says no such thing — our act of 1798 says no such thing ; they merely limit the time of entry, but require no possession of twenty complete years, for this or any other purpose. Well, if those statutes do not require it, what is it that does require it? Is it the common law? .Let us, then, lay the statutes of limitation out of the question, and then let us inquire what length of possession did the common law require. Does it say anything about twenty years, or thirty, or fifty, or even three score years ? No. Time immemorial was its only limitation — time whereof the memory of man runneth not to the contrary, and beyond which, of course, no proof could possibly reach. But will any one say, that a possession for time immemorial was necessary to support an ejectment or other possessory action ? No one will say so. It is true, that in early times, it was customary, in actions of ejectment, to * deduce title from the general proprietors, and thereby *18 to cut off all pretensions of the defendant at once, and that this continued to be the custom up till the revolutionary war, and for some time afterwards; and it is true, too, that this is done even till this day, when it can conveniently be done, because it is by far the shortest and safest course, for it stops the mouth of the defendant in limine. But the conclusion that is drawn from this, to wit, that the ejectment was put upon the same footing as the writ of right, and required the same proof, and had the same consequences, is not true. It never was put upon the footing of the'writ of right; it never was conclusive, upon the right of property ; it never did necessarily require such deduction of title; but, on the contrary, always depended upon, and was governed by, its own proper principles; and, except in’ the cases I have mentioned, kept within its own proper bounds. I never heard of a non-suit or a decision made against the plaintiff, upon the ground that he had not made such deduction of title, except in one case from Sussex, I think, in the Court of Errors, at Perth Amboy, and in that, probably, theré might have been intermingled other operative reasons, not much connected with the case, and not now easy to be traced.
There has been cited from one of the books, Espinasse, (I think) a passage to this effect, that proof of possession within twenty years is not only necessary to support the title of theles-sof of the plaintiff, hut such possession for twenty years, without interruption, shall he a good title in itself to recover in ejectment, without any other; and from this it has been argued, that a possession of twenty years, at least, without interruption, is 'necessary to maintain this action. But a little attention to the author, and to the cases from which he deduces his position, will shew satisfactorily that this is not the meaning. He means to say, and does say, that a possession within twenty years is sufficient to maintain an ejectment, unless an older and a better possession be shewn, but that a possession for twenty years without interruption, under the 21 Jac. 1, gives a right of possession, than which *19 no better can be shewn, and which cannot bo overcome in this action, for that the statute cuts off the right of entry from the defendant as well as from the plaintiff, and therefore if he has suffered his right to sleep for twenty years it is gone, and he could have had no right to make the entry which is the commencement *of his present possession. The truth is, that all possessory actions are founded upon a peaceable possession in the demandant or plaintiff, and those under whom he claims; and such possession, without regard to the length of time it may have continued, is sufficient to maintain such action, and can only be overcome by an older or better right.
I conclude, then, that the lessor of the plaintiff, in an action of ejectment, must always count upon and shew a possession of the land within the time to which the right of entry is limited, and under our act of 1798, within twenty years next before the action brought, otherwise he is barred ; but that he need not show a possession of twenty complete years, or of any other number of years, further than is necessary to constitute a full and peaceable possession; and that this being merely a possessory action, and the possession to be proved not being intended to establish the ultimate right, and not depending for its validity upon the manner in which it commenced, but being a mere matter in pais, it may be shewn as well without deed as with it, though, when without it, it will always be looked upon with greater jealousy, and be overcome with greater ease.
These things being premised, let us see how the case stands.
It appears, from the statement of the j udge, to have been in evidence, that one William Miller, in the years 1754, ’58 and ’59, purchased and took deeds for three tracts of land in Penn’s Neck, which tracts together were afterwards called Miller’s mill tract, and embrace the premises in question; that Miller afterwards exercised certain acts of ownership upon this land, and particularly, that in 1774 he *20 mortgaged a part of it to one Andrew Sinnickson, which mortgage was afterwards satisfied and paid; that in 1780 or ’81 he .was still in the actual possession of it, and early in 1782 gave it in exchange for other lands to one Samuel Burnham, who thereupon took possession of it, and in the autumn- of the same year, 1782, sold it to John Somerill and Thomas Carney; that Somerill immediately entered upon it, and continued in the actual possession of it till his death, which was in 1785 or ’86; that after Somerill’s death, his widow remained in the house, and, together with Carney, leased out the mill to one Wightsell, for two successive years, who held as their tenant, and paid them rent; that in 1788 Thomas Carney, himself, leased the mill to one Curriden, for one year, who took possession * under that lease, and held during the term ; that towards the close of that year Thomas Carney died, after which Soinerill’s widow, who 'still lived on the place, took the mill herself for one year; then one ITopman, her son-in-law, had it, and after that one Humphries rented it.
It appears further to have been in evidence, that Thomas Carney died in possession of the premises now in question, and intestate as to the same, leaving two daughters, Ruth and Hannah, his only children and heirs at law; and that soon after his death, that is to say, in the year 1793, a division of this whole tract, called sometimes Miller’s mill tract, and sometimes Penn’s Neck mill, was divided by commissioners, appointed by the Orphans’ Court of Salem county, between the heirs of John Somerill and Thomas Carney; and Carney’s part again between his daughters Ruth and Hannah; which said divisions were, by the said court, approved and recorded.
It appears further to have been in evidence, that Ruth, the elder of the two daughters, married one Benjamin Cripps, had issue living, a son and daughter, and died February 17, 1794, leaving her said husband surviving her; that her daughter died in infancy, and that her son, who *21 was named Thomas Oarney Cripps, survived her, but after-wards died intestate and without issue, September 13,1804; that Hannah Oarney, the younger of the two daughters, married Robert Gr. Johnson, and afterwards died, September 29,1811, leaving a son and daughter, who are the lessors of the plaintiff.
And it appears further to have been in evidence, that the said Benjamin Cripps and Ruth, his wife, after the division of the said land, so as aforesaid made by the said Orphans’ Court, entered into, and took possession of that part of the same which was allotted to the said Ruth; that the said Cripps was in the actual possession thereof in the year 1794, when the sheriff sold Somerill’s interest in the whole tract; and that his (Oripps’) life estate in that part allotted to the said Ruth, was also sold by the same sheriff to one John Sinnickson, who had purchased Somerill’s interest; and that the said Benjamin Cripps died January 27, 1813. And it was further in evidence, that the premises in question, now in possession of the defendants, are part of the said land so as aforesaid allotted to the said Ruth.
* Here then, I think, is evidence of one continued undisturbed possession in the lessors of the plaintiff and those under whom they hold, from the year 1759, at least, till the year 1813, being a period of fifty-four years, and therefore evidence which, if credited by the jury, places the plaintiffs’ right to recover out of the reach of controversy; and -whether to be credited or not, was for the jury themselves to deteimine.
I say, there was evidence of a continued undisturbed possession, for it certainly can never be pretended, that the mere making of the mortgage by Miller to Sinnickson, so breaks in upon the possession of the mortgagor, as that neither he nor his alienees can count upon it afterwards; and still less will it be pretended, that a mere intruder can set up either against him or them an outstanding mortgage, and especially a satisfied one like the one in question.
*22 It will readily be admitted, I presume, that upon' the death of Thomas Carney, his undivided moiety of this land, if he really had a moiety, descended to his two daughters, Ruth and Hannah'; that, upon 'the division by the Orphans’ Court, Benjamin Cripps and Ruth, his wife, became seized in severalty of that part allotted to them; that, upon the death of Ruth, it descended to her son, Thomas Carney Cripps, and upon his death to Hannah, his mother’s sister, and upon her death to her children, the lessors of the plaintiff, subject nevertheless to the life estate of Benjamin Cripps, the husband of Ruth, who took as tenant by the curtsy. •
And it will be admitted, too, that the possession of the tenant for life, even though the estate for life should pass into twenty hands successively, is still the possession of the reversioner, so that he who enters or holds over against such reversioner after the termination of the life estate, so far from being able to justify himself under an adverse possession, is directly guilty of that species of ouster called in our books an intrusion, and may be immediately dispossessed by the mere entry of the reversioner or remainder man.
Upon whichsoever of the two grounds first stated we may go, therefore, I see nothing in the case that, in point of fact, can support the motion ; and even if it were otherwise, and the lessors of the plaintiff had given no evidence of a possession of twenty complete years, but only of a possession within twenty * years, the motion must fail, for the law is not so. In my opinion, thereforé,
Let the rule for a new trial be made absolute.
A new trial, was had at the Salem circuit, in December, 1821, and a verdict rendered in favor of the defendants. A rule was then obtained, on the part of the plaintiffs, to set aside- this verdict, and for a new trial; which was argued *23 in May term, 1822, by White and Southardl, for plaintiff, and L. H. Stockton and Wall, for defendant, and now at tliis term the court delivered their opinions.
Eobskll, J.
William Miller, in the year 1762, came into possession of a plantation or tract of land, situate in the county of Salem, afterwards well known by the name of Miller's mill tract. He, in the year 1774, to secure the payment of £200, borrowed by him of Andrew Sinnickson, gave a mortgage on this tract, and built a mill on it. In 1782, he removed oil to a plantation a few miles distant, which he purchased, by deed, of Samuel Burman; and Burman removed on to the Miller tract, and for several years used it as his own, offered it for sale, and was the reputed owner of it. In 1784 John Somerill moved on, and it was said, that he and Thomas Carney had bought it of Burman. They rented out the mill to several tenants, at different times; received the rent; repaired the mill and dam; and paid to Sinnickson the yearly interest arising on his mortgage from Miller, and used it as their own until the death of Somerill, in the year 1786. His widow continued to live on it, and with her brother, Thomas Carney, rented the mill to different tenants, until the year 1788, when Thomas Carney died, leaving that part of the Miller tract, he said he had purchased of Burman, to his daughters Euth and Hannah.
In 1793 application was made to the Orphans’ Court of the county of Salem, for a division of the landed estate of Thomas Carney amongst his heirs. A part of the Miller tract was thus divided and set off to Euth, the daughter of Thomas Carney, she then being the wife of .Benjamin Cripps. Oripps took possession of one hundred and fifty acres of this tract, the share allotted his wife. The widow of Somerill held in severalty, and continued to occupy the other part of the tract, except the mill and about fourteen acres of land, which was not divided by the commissioners acting under *24 tlie authority of the Orphans’ Court. *In 1794, John Sinnickson, the son and executor of Andrew Sinnickson, and to whom the mortgage on the Miller tract had been assigned by his father, obtained a judgment against William Miller, for the amount, principal and interest, due on the mortgage from Miller, of this tract; also two or three judgments against the widow Somerill, administratrix of her husband’s effects, and for her own personal debt due the estate of Andrew Sinnickson. Executions were issued on these judgments, and one or more levied on the Miller tract, which was advertised as the property of Miller, and sold, together with the Somerill right, by the sheriff, in discharge thereof. The executor of Carney, Benjamin Cripps, the widow Somerill, with fifty or sixty other persons, were present at this sale. The widow Somerill objected to the sale, unless her dower or her right, the witness does not recollect which, was paid for; but, after some private conversation with John Sinnickson, she consented to the sale. Benjamin Cripps at first, also, made some objections, and he said Thomas Carney’s executor ought to have paid the money due on the mortgage, and that he had sufficient funds in his hands, of Carney’s, to do so. This was denied by the executor, and Cripps said, “he would make him smoke for it.”— The objections being withdrawn, the place was bid off to John Sinnickson for £600, who went immediately into possession of the mill and plantation; rented them to different yearly tenants, until the year 1796, when he sold to William Miller, above mentioned, who went into possession; had it run out and divided, by will, between his two sons, Adam and Samuel, and died on it in 1798. These sons possessed it for some years; sold it in 1799, when, by several mesne conveyances, a part of it, for which this action is brought, came into possession of the defendant by purchase.
It is contended on the part of the plaintiffs, who claim under Thomas Carney, that the foregoing facts draw with them the irresistible conclusion, that Burman had received *25 from Miller, in 1782, a deed in fee simple for these premises, and passed them by a like deed, in 1784, to Somerill and Carney, as tenants in common, in the whole premises until the death of Carney, and the division of his estate, by order of the Orphans’ Coart in 1793, amongst his heirs; from which time each held a moiety in severalty, except the mill and fourteen acres not divided, and which they continued to hold in common. That this action was *brought for a part of the Carney division, held by them in severalty, and the jury were unconditionally bound to find the defendant guilty ; the more so, as the judge before whom the cause was tried charged them strongly in favor of the plaintiffs.
On the part of the defendant, it is as strenuously contended that the plaintiffs have shewn no title to the premises, but a mere possessory one for a few years ; that when Miller mortgaged this land to Andrew Sinuickson he parted with all his legal title to that estate, and as he held only an equitable estate, that was all he did or could sell (if he sold at all) to Burrnan, who could pass no better estate to Somerill and Carney, than he held himself; that this was known to Somerill and Carney, who bought subject to the mortgage held by Sinnickson ; paid the interest on it to Sinnickson for a number of years, until being unable or unwilling to pay it off, it was sold for that purpose by the sheriff of Salem, as the property of Miller, to the highest bidder, in their presence; that, as Somerill and Carney, went into possession in 1784, and the sale by the sheriff was in 1794, the affair was so recent, that if deeds, such as they contend for, had been executed by Miller to Burrnan, and by him to Somerill and Carney, they or their heirs, or representatives, could have produced them, and shewn by such incontestable evidence, that Miller had not a shadow of right to this farm and mill; nor would they have suffered it to be sold by the sheriff to pay his debts; or if, by any accident, such deeds had been lost, they, being in possession, would have stated *26 the facts, and appealed to the multitude assembled at the sale, and called on Miller, also present, to corroborate their statement; that to publicly acquiesce in a sheriff’s sale of a, valuable property in their possession, yúthout a struggle, incontestably proves, that they were sensible they had no legal right to oppose the sheriff’s proceedings; that, by virtue of the sheriff’s sale, this property has since passed through several hands, for a valuable,consideration, without any objection from the Somerills, Benjamin Oripps, (who died in 1813) or any other person, and as the plaintiff could not shew any written title, the jury were bound, on every principle of justice, to find as they did, for the defendant.
The judge summed up the evidence, and expressed himself stroDgly in favor of the plaintiff’s claim, but left the whole of the facts, as given in evidence, for the serious consideration of * the jury, who found a verdict of not guilty ; and we are now called on to set aside this verdict, and order a new trial.
As this was a question of right between the parties, depending altogether on the previous possession of the plaintiff’s grandfather, without a particle of paper title, in the form of a deed, to support their claim against the possession and documentary title of the defendant, it was properly left to the jury to decide, on the facts and evidence before them, the right of the contending parties.
It is a fundamental principle in ejectments, that a plaintiff 'must recover on the strength of his own title only, and not on the weakness of his adversary’s. A person in possession of land is always in presumption of law, legally possessed, until the contrary appear. When a plaintiff seeks to gain a possession which he supposes ought to be in him, he is bound to prove his better right, to the satisfaction of a-jury, by shewing a real substantial and then subsisting title in himself; and, without such proof, the law will not suffer the possession of the defendant to be disturbed. The action of ejectment being a possessory one, the proof of'the plain *27 tiff will be in correspondence with bis claim. lie may only have the right of possession, an estate for years, for life, or in fee simple; but in all these his proof must satisfy the court and jury of the legality and justice of his claim, before he has a right to expect a verdict in his favor.
It was, in the present case, proved by the defendants, without contradiction, that J. Sinnickson, under whom they claim, came into possession of this land by virtue of a public sale made by the sheriff of the county, with the knowledge, and in the presence of all the parties concerned : that Benjamin Oripps, the son-in-law of Thomas Carney, a man of business and property, in actual possession of this land in 1796, relinquished that possession, and although living in the county until 1813, a period of sixteen or seventeen years, without a pretence that this property levied on and sold as Miller’s, was unlawfully taken out of his possession. Mrs. Somerill, with her family, then living on the promises, also gave up her possession without opposition, and all this in the presence of and without objection from the executor, of Thomas Carney, all well acquainted, it is to be presumed, at that day, with the title by which the lands were held. If the estate held by Miller, passed out of him to Burman in 1782, by a *deed in fee simple, and from Burman to Somerill and Carney, in 1784, by a like deed, as contended for by plaintiffs, is it reasonable to suppose, that persons in actual possession of those lands, by the highest title our law recognizes, without claim or publication of that title, would suffer it sold in their presence to pay the debts of another person, without right to a single foot of it? To give up, without a struggle or complaint, a largo and valuable tract of land and mill, under such circumstances, would be in direct opposition to every principle by which the human mind is actuated. Indeed, it would be a fraud practised on the purchaser, for them to stand by and see these lands sold for a large sum, as the property of a man by whose conveyance, years before, the fee simple of the whole was vested in them.
*28 On the foregoing- facts, and considerations naturally arising out of them, it was the province of the jury to decide. They have so done, and we are called on to set aside this decision, and grant a new trial to the plaintiffs.
The doctrine of new trials is at this day well understood, and the court in no case, on slight grounds, will disturb the verdict of a jury. . In general, if the jury has misbehaved, given a verdict without or against evidence, or excessive damages, or manifestly contrary to law and the charge of the judge, or for corrupt practice of the parties, the court will grant a new trial. So if there is newly discovered important evidence, not within the knowledge, possession, or power of the party at the trial, or clear and palpable injustice done in a matter of importance, the court will interfere, that truth and justice may prevail. But in ejectments, where the plaintiff failing in his fix’st attempt is at liberty to bring a new action, the court generally leaves him to that remedy, and the numerous authorities cited by the counsel for the defendants, not now necessary to repeat, are thearqple proof that where the verdict is for the defendant in ejectment, that courts seldom intexffere; and I have not been able to find a single case where two verdicts have been , given for defendants in ejeetment, essentially on the same title, that a court has granted a new trial; indeed we have several times refused to grant a rule to shew cause after two verdicts, not in ejectments. If precedents are to govern in any case, it is assuredly in those where a refusal deprives a party of no right he is actually in the possession of. Two verdicts have been given against the plaintiff, and although there are some *slight shades of difference they are substantially the same, founded on the same title, and supported by the like facts and circumstances; and I see nothing in either of them that should induce this court to prosti’ate all previously established rules in favor of them. To do so would make the boasted • trial by jux’y a mere mockery. I am therefore of opinion, that the plaintiffs take nothing by their motion.
*29 Ford J.
As the court and jury had some important misconceptions of this cause, I am of opinion that a new trial ought to be granted. Our attention, during a long trial, was chiefly engrossed by a mortgage, and the possession of the mortgagee under it, enforced by his having purchased the equity of redemption; yet so imperfectly were the surveys, maps, and protractions canvassed at the trial, that not only both parties, but the court and jury also, mistook the bounds. It is now shewn by these documents, I say irrefragably shewn, that the mortgage does not take in the lands in dispute, nor come within half a mile of them; and yet I have no doubt that the verdict ivas founded either wholly on this mortgage, or most materially induced by it. On a future trial, this mortgage will be laid out of the case, and the presumption of a deed from Miller to Burman will come up singly for consideration. Miller and Burman owned plantations of about equal size and value, and agreed to exchange even. Miller got a deed and peaceable possession of Burman’s plantation, and delivered up the peaceable possession of his to Burman, who sold it for valuable consideration to Somerill and Carney; these last, becoming seized of the plantation, cut timber on it, rebuilt the floom and part of the mill, and at their deaths the plantation descended to their heirs, and was divided between them, according to the act of the legislature for partition of lands. Hence the presumption of a deed from Miller to Burman becomes violently strong, otherwise Miller will have both plantations, in defiance of the exchange. I think the jury would have had no hesitation on this point, if it had come up singly before them.
Kirkpatrick C. J. concurred in this opinion.
Let the rule for new trial be absolute.