32 N.J. Super. 419 (1954)
108 A.2d 458
RICHARD PREDHAM, PLAINTIFF-RESPONDENT,
v.
CHARLES HOLFESTER AND PEARL GRAVATT, ALSO KNOWN AS PEARL HOLFESTER, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued September 20, 1954.
Decided October 22, 1954.
*420 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Harry Edelson argued the cause for appellants.
Mr. Robert V. Carton argued the cause for respondent (Messrs. Durand, Ivins & Carton, attorneys).
The opinion of the court was delivered by JAYNE, J.A.D.
The present appeal encourages a consideration, perhaps, more accurately stated, a reconsideration, of one of the constituent elements of the proof of the adverse possession of land in the law of our State.
Although the question addressed to us is solely one of law, a succinct statement of the factual setting from which it arises is appropriate.
On March 14, 1946 the plaintiff acquired by deed lots Nos. 5 and 6 on Sylvania Avenue in block No. 39 as delineated on the tax map of the Borough of Neptune City, Monmouth County. The defendant Pearl Gravatt, now Pearl *421 Holfester, wife of the defendant Charles Holfester, had theretofore purchased by deed the adjacent lots Nos. 7 and 8 on June 24, 1940.
In 1922 one Ernest Stauch became the owner of lots Nos. 7 and 8 now owned by the defendants, and from the evidence it seems probable that in 1923 it was the father of Ernest Stauch, the then occupant of the premises, who initially provided a vehicular driveway along the west side of lot No. 7 adjacent to lot No. 6, but its exact location in relation to the easterly boundary line of lot No. 6 has not been definitely established by proof. In 1925 Ernest Stauch erected a garage with a second story apartment above on the rear of lot No. 7 and coincidentally constructed the concrete driveway at its present location. On June 6, 1953 the plaintiff caused a survey to be made by which the east line of lot No. 6 was ascertained and it was then discovered that a portion of the concrete driveway at its northwesterly point was.30 of a foot and at its southwesterly extremity .58 of a foot upon the plaintiff's lot No. 6.
The plaintiff prosecuted the present action in the Chancery Division judicially to establish his lawful ownership of the strip of land upon which the driveway encroached, to enjoin the defendants from its continued use and to require the defendants to remove the overlap. The defendants resisted the plaintiff's alleged cause of action by the averment of adverse possession.
Preliminarily we may observe that the common law did not recognize the loss of corporeal hereditaments by one and their transmission to another by the lapse of a period of adverse holding. Such seemed to be oppugnant to one of the most fundamental axioms of the law. It was said in Altham's Case, 8 Coke Rep. 153; 77 Eng. Reprint 707:
"For true it is, that neither fraud nor might Can make a title where there wanteth right."
Title by adverse possession, it was thought, resembled the tortious acquisition of land without paying for it. The procurement *422 of tangible realty by adverse possession was therefore the creature of legislation.
Before 1237 claimants had been required to prove seisin on the day in 1135 when King Henry I died; then they were restricted to the day in 1154 when Henry II was crowned; in 1275 the boundary was moved forward to the coronation of Richard I in 1189 and there it remained for many years. Indeed, the length of the period progressively enlarged until in 1541 a claimant might be obliged to establish an adverse holding for over 300 years in order conclusively to sustain his title.
It appears to have been the statute (32 Hen. VIII, ch. 2) which inaugurated the policy of designating a definite period of years counting backward from the time of the litigation. It fixed 60 years as the period in real actions, but the statute did not apply to the increasing number of ejectment actions, and that circumstance, inter alia, doubtless motivated the enactment of the statute of limitations, 21 Jas. I, ch. 16 (1623), which forbade entry on land by one against whom it had been adversely held for 20 years or more.
The foregoing historical comments, not especially unfamiliar, have taken a range much wider than is warranted by the specific subject with which we are here concerned, but they are in general indicative of the consanguinity of our legislation on the subject. Sections 1 and 2 of the act of June 5, 1787 (2 Gen. Stat. 1972) fixed the 60- and 30-year periods. Section 9 of the act of February 7, 1799 (2 Gen. Stat. 1977, § 23) established the 20-year limitation. Their statutory descendants may now be found in N.J.S. 2A:14-30 and 2A:14-6. The decisions in Den ex dem. Johnson v. Morris, 7 N.J.L. 6 (Sup. Ct. 1822); Lehigh Valley R.R. Co. v. McFarlan, 43 N.J.L. 605 (E. & A. 1881); Spottiswoode v. Morris & Essex R.R. Co., 61 N.J.L. 322 (Sup. Ct. 1898), affirmed 63 N.J.L. 667 (E. & A. 1899), are exceedingly informative.
We may also interrupt to remark that there is a distinction in the legal catalogue between title by adverse possession and title by prescription. Where title to corporeal *423 property passes by the lapse of time, it is gained by adverse possession, while accurately stated, prescription denotes the acquisition by the lapse of time of title to incorporeal hereditaments only. Vide, Plaza v. Flak, 7 N.J. 215 (1951).
Prescription has been developed by the courts, aided but little by legislation, except by way of analogy, while adverse possession may be said to be almost exclusively statutory. We allude to that dissimilarity because while in the present case the segment of land in controversy is alleged to have been adversely used practically as a driveway, the right to its continued use is not claimed by the defendants as an easement but by virtue of the defendants' alleged adverse possession.
Then, too, we conclude from our examination of the evidence, as did the trial judge, that the use of the designated strip of land by the defendants and their predecessors in title and occupancy is not disclosed to have originated prior to the year 1925.
A concordant procession of judicial authorities has over the years declared that a user to be recognized in the law as adverse must be shown to have been hostile, exclusive, continuous, uninterrupted, visible, and notorious. Cornelius and Empson v. Giberson, 25 N.J.L. 1, 31 (Sup. Ct. 1855); Cobb v. Davenport, 32 N.J.L. 369, 385 (Sup. Ct. 1867); Carlisle v. Cooper, 21 N.J. Eq. 576, 596 (E. & A. 1870); DeLuca v. Melin, 103 N.J.L. 140 (E. & A. 1926); Poulos v. Dover Boiler & Plate Fabricators, 5 N.J. 580, 588 (1950); Plaza v. Flak, supra.
The author of this opinion recalls stating in Morrissey v. Jackson, 3 N.J. Super. 365 (Ch. Div. 1949), that:
"The nature and character of the possession is a question of fact, and the obligation to prove all of the constituent elements of adverse possession devolves upon the party who alleges such a claim. Possession as a presumption of law is intended only in favor of the holder of the legal title."
The descriptive import of the adjective "hostile" has been said in the above cited cases and in many others to mean a *424 user under a claim of right, pursued with an intent to claim as against the true owner in such circumstances of notoriety that the owner will be aware of the fact and thus alerted to resist the acquisition of the right by the claimant before the period of adverse possession has elapsed.
In the present case Mr. Ernest Stauch testified that while he was the owner of lots Nos. 7 and 8 he observed at the northeasterly front of his lots a "white marble stone" about five inches square with an indentation in the center of it and situate "about two feet in from the inside edge of the sidewalk," which he supposed was the "corner-stone" indicating the location of the dividing line between lots Nos. 6 and 7. He related that with the intention to place the present concrete driveway entirely on his own lot No. 7, he established the easterly side of the driveway on a line approximately two feet west of a line drawn appropriately from the white marker. And then it is stipulated in the pretrial order and indeed confirmed by the testimony of the defendants themselves that they were wholly unaware that any portion of the driveway overlapped the line of the plaintiff's lot until they received a communication of that purport from the plaintiff's attorney on June 22, 1953.
From that state of the uncontroverted evidence emerges the legal question whether the defendants had supplied proof of the required quo animo, that is, the hostile intent to claim the land as against the true owner. Does such a possession of the land of another due entirely to mistake and without any quality of premeditated and predesigned hostility nevertheless constitute evidence in the law of our State of the hostile intent essential to the proof of adverse possession?
The question is not a new one here nor in our sister states. Informational commentaries on the topic are available in 17 N.Y.U. Law Rev. 44; 9 Harvard L. Rev. 464; 33 Yale L. Journ. 141; 7 Oregon L. Rev. 329; 3 Vanderbilt L. Rev. 337; 45 Michigan L. Rev. 204.
A review of the American cases occurring over the span of years seems to illustrate how impracticable has been the *425 judicial inclination and disinclination to inject into statutory adverse possession the early common-law doctrine of disseisin which embraced an intention "to usurp the possession and to oust another of his freehold" and consequently to explore the invisible motives of the claimant's mind.
As illustrations we may well select the early discordant decisions from two states so geographically near as Maine and Connecticut. In Brown v. Gay, 3 Me. 126 (Sup. Jud. Ct. 1824), followed loyally by Ross v. Gould, 5 Me. 204 (Sup. Jud. Ct. 1828); Lincoln v. Edgecomb, 31 Me. 345 (Sup. Jud. Ct. 1850); Dow v. McKenney, 64 Me. 138 (Sup. Jud. Ct. 1875); Preble v. Maine Cent. R. Co., 85 Me. 260, 27 A. 149, 21 L.R.A. 829 (Sup. Jud. Ct. 1893), it was resolved that one who by mistake occupies for 20 years or more land not covered by his deed, with no intention to claim title beyond his actual boundary line, wherever that may be, does not thereby acquire title by adverse possession beyond the true line.
In French v. Pearce, 8 Conn. 439 (Sup. Ct. Err. 1831), followed by a majority of American courts, it was held that while the possessor must hold the land as his own during the requisite period, his motive or intention in taking and retaining possession is otherwise immaterial with respect to its adverse character.
Research immediately discloses, however, that of the relatively numerous decisions some may be characterized as positively dissident, some divergent, and some discriminative. Those courts which indulge in analyzing the nature of the intent introduce us to dissimilar states of mind denominated "unconscious intrusion," "conscious doubt," "subjective intent," "conditional," "unconditional," "provisional," "presumptive," and "pure mistake."
Our state courts have been seated in the congregation last mentioned. Such has been the deduction derived from the opinion of the Supreme Court in Myers v. Folkman, 89 N.J.L. 390 (Sup. Ct. 1916), and reinforced by the decision of Vice-Chancellor Leaming, unanimously affirmed by the former Court of Errors and Appeals, in the action in equity *426 between the same parties reported sub nom. Folkman v. Myers, 93 N.J. Eq. 208 (E. & A. 1921).
The following quotation taken from the opinion of the learned vice-chancellor is clearly adaptable to the factual circumstances of the present case (93 N.J. Eq. 208, at page 214):
"* * * Indeed, it seems impossible to conceive the existence of an intention upon the part of a vendee to claim title by possession of land not covered by his deed when he has no knowledge or thought that his possession may embrace land not conveyed by his deed, and has no intention of encroaching on the rights of another; the belief that the land in possession is covered by the deed is inconsistent with the intent to claim title and to hold against the world, since the intent is to hold one's own land; but the absence of an intent to invade and the absence of knowledge of the invasion of the rights of another is inconsistent with a concurrent defined intent to hold in case it should be found that the possession is wrongful, because the alternative intent to hold in case it should be found that the holding is wrongful could not enter the mind unless or until some thought of possible error had occurred."
Obviously our court then of last resort honored the rule expressed by Freeman in his notes in 24 Am. St. Rep. 389 and in 62 Am. Dec. 527 that the rule is that "where the owner of lands, through ignorance, inadvertence or mistake, takes and holds possession beyond his true line, but with no intention of claiming further than his actual boundaries, such possession is not adverse and will not support a plea of the statute of limitations."
We have previously revealed that our subsequent adjudications have continuously maintained that the user must be under a claim of right, pursued with an intent to claim as against the true owner.
It was in respectful recognition of the law thus adopted in this jurisdiction that Judge Schettino determined that the evidence adduced by the defendants at the trial of the present action failed to establish an essential element of the alleged adverse possession.
Yes, it must be acknowledged that the rule to which our own courts adhere has been vigorously criticized. That it is the minority rule is demonstrable. It is critically *427 asserted that it operates to deny the otherwise acquired right of possession to the honest possessor and rewards only the willful wrongdoer. It is said to be subversive of a statute of repose, designed to give effect to the interest of the community in the security of titles and to afford protection to the long-time ostensible owner of the land. The fallacy, it is charged, in ascribing legal essentiality to the "subjective hostile intention" inheres in depositing emphasis upon what the innocent and mistaken possessor would have intended had he known the facts rather than upon his actual, visible, and notorious acts. It is, it is said, to be inferred that a possessor's notorious use and occupation of land which he believes to be his own is nevertheless hostile to all the world in the meaning appropriate to adverse possession.
It is explained that whatever the mental attitudes, the claimants' possession, if wrongful, gives rise to a cause of action by the record owner in ejectment and the statute necessarily runs against the prosecution of that action.
In a recent decision of the Court of Appeals of Maryland, Tamburo v. Miller, 203 Md. 329, 100 A.2d 818 (1953), it was stated and subsequently quoted in Ridgely v. Lewis, 105 A.2d 212, 213 (Ct. App. Md. 1954):
"* * * The modern trend and the better rule is that where the visible boundaries have existed for the period set forth in the Statute of Limitations, title will vest in the adverse possessor where there is evidence of unequivocal acts of ownership. In this view it is immaterial that the holder supposed the visible boundary to be correct or, in other words, the fact that the possession was due to inadvertence, ignorance, or mistake, is entirely immaterial."
The authors of American Law of Property (vol. III, § 15.5, at pp. 786, 789) have expressed the following conclusions:
"* * * The weight of authority strongly supports the position that the mental attitude of the possessor is immaterial, and an actual open and notorious possession which is wrongful since it is without the consent of the owner is necessarily adverse and ripens into title in the usual way when the period of the statute has run.

* * * * * * * *
*428 Why a man without title who as an honest man admits that he wanted only what was his, and occupied in the belief that the land was his, should be worse off than the wilful wrongdoer who enters and occupies in order to get title by adverse possession is not explained in these cases. They are necessarily wrong as a matter of legal principle because they disregard the plain operation of the statute of limitations which alone gives title by adverse possession. They are highly inexpedient, if we look at the matter from the practical standpoint, because they substitute all the uncertainties and ambiguities which arise out of a test depending on proof of an actual mental state for the simple objective physical test of possession actually adverse evidenced by acts of user and enjoyment of the average owner."
Frequently quoted in the more recent treatises dealing with this feature of the law of adverse possession is the following statement in 2 Dembitz, Land Titles (1895) 1397:
"If possession through mistake were held not to be adverse, very little room would be left for the statute of limitations, for almost every man who buys land under a bad title labors under the mistaken idea that his deed is good and effectual."
See, Tiffany, Real Property (3d ed.), § 1159, p. 471; Thompson, Real Property (perm. ed.) §§ 2645, 2649, pp. 452, 461.
We have endeavored here to portray the question presented and to sketch the discordance in the relative decisional law. True, the present appeal importunes us to depart from the rule of law clad with the approbation of our former Court of Errors and Appeals and become affiliated on this subject with the courts of the majority of the states. We conceive that venture to be beyond the proprieties of our appellate function. "Inversions and modifications of the existing decisional law more appropriately abide within the domain of the court of last resort." Greenspan v. Slate, 22 N.J. Super. 344 (App. Div. 1952), existing principle overthrown 12 N.J. 426 (1953).
The judgment is affirmed. No costs.
FRANCIS, J.A.D. (concurring).
Judge Jayne's exhaustive research has demonstrated beyond question that New Jersey *429 follows the minority view on the phase of the doctrine of adverse possession which formed the basis of the decision of the trial court.
My only purpose in adding this short memorandum of concurrence is to express the conclusion that even if our State followed the majority rule, I would vote to affirm on the facts. If the rule were to be adopted that the intent with which the land is used or encroached upon or taken is immaterial, it seems to me that then the emphasis would have to be laid upon the character of the possession assumed by the taker. That is, the wrongful possession or encroachment ought to be so open and notorious as to leave no doubt in the mind of a reasonably intelligent owner that an adverse user of his land had been established. Unless such aggressive trespass is established, an unintended continuing wrong should not ripen into title.
In the present case, the concrete driveway encroachment is .30 of a foot at the northwesterly point and .58 of a foot at the southwesterly terminus, and there is nothing in the slightest degree unusual about it that would serve to call the encroachment to the attention of the unsuspecting owner whose property rights were being violated. If such an unintentional and comparatively insignificant continuing trespass were adjudged to eventuate in title with the passage of the prescribed period, then the elements of openness and notoriousness in the law of adverse possession have no real significance. The statute of limitations is not a club in the hands of a wrongdoer, whether a willful or an unintentional one; it is a prod in the back of the victim, the prod being powered by the conspicuous nature of the adverse use.
In my judgment, whatever test is applied here, the user by the defendants has not been sufficiently open and notorious to create title by adverse possession.