DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY.

NOVEMBER TERM, 1881.

---

LEHIGH VALLEY RAILROAD COMPANY, PLAINTIFF IN ERROR, v. McFARLAN, DEFENDANT IN ERROR.

1. The charter of the Morris Canal and Banking Company empowers the company to take and appropriate to its use any lands or waters necessary for the erection and use of its canal for the purposes of navigation, without compensation first made, subject nevertheless to the right of the owner of lands or water-rights so taken and appropriated, to compensation for his damages, to be ascertained in the manner prescribed by the charter.

2. The twentieth and twenty-seventh sections of the charter secure to persons injured in their property-rights a remedy in conformity with the ordinary rules regulating actions at law, according to the nature and extent of the injury sustained. If the injury be one that is temporary and recurrent, successive actions for damages sustained from time to time may be the proper remedy. But when the company has effected a complete appropriation of property by the location of its canal on lands or the appropriation of water-rights to its use, by the construction of works designed to effect a constant and continuous diversion or flooding back of waters, such lands or water-rights are taken, the injury is then done and the damages consist in the entire value of the property and are recoverable in one action; the taking and appropriation being lawful, the occupation or use of the property

605

so taken or appropriated cannot be considered a continuing wrong for which successive actions will lie.

3. Where property has been permanently appropriated by the company to its use, the action reserved to the owner by the twentieth section of the charter is the means provided for him to obtain an appraisement and recovery of his damages, in case the company does not proceed to obtain an appraisement by commissioners, pursuant to the sixth section, and the damages recoverable in such action will be the same compensation which is determinable by the award of commissioners— full compensation for the injury done by the appropriation of the owner's property to the company's use.

4. In analogy with the statute of limitations, which applies only to corporeal hereditaments, the enjoyment of an incorporeal hereditament, adverse, exclusive and uninterrupted for twenty years, affords a conclusive presumption of a grant to be applied as a *presumptio juris et de jure.*

5. The owner of the servient tenement cannot overcome the presumption of a grant arising from an uninterrupted user of twenty years by proof that no grant was in fact made. He may rebut the presumption by contradicting or explaining the facts upon which it rests, but he cannot overcome it by proof in denial of a grant.

6. The owner of the servient tenement may show that the right claimed is one that could not be granted away, or that the owner of the servient tenement was legally incapable of making, or the owner of the dominent tenement incapable of receiving such a grant. He may explain the user or enjoyment by showing that it was under permission asked and granted, or that it was secret and without means of knowledge on his part, or that the user was such as to be neither physically capable of prevention nor actionable. But if there be neither legal incompetency nor physical incapacity, and the user be open and notorious, and be such as to be actionable or capable of prevention, the servient owner can only defeat the acquisition of the right on the ground that the user was contentious, or the continuity of the enjoyment was interrupted during the period of prescription.

7. Mere denials of the right, complaints, remonstrances or prohibitions of user, unaccompanied by any act which in law would amount to a disturbance, and be actionable as such, will not prevent the acquisition of a right by prescription.

On error to the Supreme Court.

For the plaintiffs in error, *T. N. McCarter* and *F. T. Frelinghuysen.*

For the defendants in error, *H. C. Pitney* and *B. Gummere.*

'The opinion of the court was delivered by

DEPUE, J.   The defendant is the lessee of the Morris Canal and Banking Company.   In 1871, the property, works and franchises of the latter company were granted to the defendant by a perpetual lease, under the authority of an act of the legislature.   *Pamph. L.* 1871, *p.* 444.

The lessor was incorporated in 1824, for the purpose of constructing a canal to unite the river Delaware, near Easton, with the tide waters of the Passaic.   *Pamph. L.* 1824, *p.* 158. The canal was constructed from the Delaware to the Passaic about 1830.   In 1845 it was enlarged throughout its entire length, to provide for navigation with boats of greater capacity. In 1857 the company renewed the timbers in its dam across the Rockaway river, and placed new flash boards upon it.   In 1875 the flash boards were replaced by timbers firmly spiked on the top of the dam, and made part of its permanent structure.

The plaintiff is the owner of a mill situate on the Rockaway river, above the site of the dam.   He complains of an injury to his mill by back water cast back upon it by means of the dam.   The damages claimed are such as accrued between the 30th of December, 1876, and the 22d of September, 1877. As his declaration was originally framed, the theory of his action was that the dam at its increased height was an unlawful structure.   At the trial the declaration was so amended as to present a claim for compensation for the damages sustained by the plaintiff between the days named, conceding that the canal company by its charter had power to take and appropriate to its use, lands and water, without compensation first made, and that therefore the dam was not, in itself, an unlawful structure.

By its act of incorporation the canal company was authorized to enter upon and take possession of and use such lands, waters and streams as might be necessary for its canal, without compensation first made.   Entry upon and the appropriation of private property to its use by the company is not a trespass.   Ejectment will not lie to oust the company from

lands on which its canal is constructed, nor are its works liable to abatement as a nuisance to the water-rights of others, though compensation has not been made to the owners of lands or water-rights taken or injured by the company in the construction or operation of its canal. This construction of the company's charter is too firmly established to be now called in question. *Kough* v. *Darcy*, 6 *Halst.* 237; *Den* v. *Morris Canal*, 4 *Zab.* 587; *Lehigh Valley R. R. Co.* v. *McFarlan*, 4 *Stew.* 706. In the case last cited, which was between the parties to this suit, and related to the dam as now constructed, this court decreed that this defendant had and still has the right, under the charter of the canal company, to erect and maintain the flash boards, the subject of complaint in this suit. The lawfulness of the dam as constructed is *res adjudicata* by the decree in the last-mentioned suit.

In this court, upon the argument of this case for the first time in the several litigations between these parties, the contention has been made that the power to take and appropriate lands and waters to the use of the company expired in 1839, under the limitation in Section 23 of the canal company's charter. At this stage of the controversy between these parties it is not permissible to raise that question. The rights of the parties in that respect have been fixed by the decree above referred to.

While the right of the canal company to enter upon and occupy lands necessary to construct its canal, and to appropriate waters necessary for the erection and use of its canal for the purposes of navigation, without compensation first made, is settled by the cases cited, it is equally well settled that the owner of lands taken, or whose water-rights are injured, is entitled to compensation for the damages sustained. The same section which confers the right to take possession of and use such lands and waters expressly declares that such possession and use shall be subject to compensation to be made therefor as is in the act directed. The twentieth section enacts that nothing in the act shall be taken to impair the right of any person to an action against the said company for damages

to his or her water-rights, lands, tenements or hereditaments by the erection of said canal; and by the twenty-seventh section it is provided that the twentieth section shall be so construed as to extend to damages sustained not only by the erection of the canal in the first instance, but also by the subsequent operations of the company from time to time, as the same may arise. Liberal as the incorporating act is to the promoters of this scheme of public improvement, its purpose was to secure compensation to the owners of lands and water-rights whose property was applied to the public use. All the cases cited recognize the right of persons injured to compensation for the injuries sustained.

The contention of counsel is with respect to the mode by which the owner of lands or water-rights shall seek his remedy. The defendant contends that upon the appropriation by the company of lands or waters to its use the right of the owner is to sue for and recover in one suit—once for all—the entire value of the lands taken or water-rights appropriated. The contention of the plaintiff's counsel is, that the occupation of lands or the user of waters without compensation having been made, is a continuing injury, for which successive actions may be brought, to recover the damages as they accrue from time to time.

The case, in the propriety of this suit, and in the form of this action and the pleadings, will turn upon the inquiry as to which of the foregoing propositions is sound. If the plaintiff's water rights were taken before the defendant's lease was made, and the right of the owner to redress by the charter is consummated and concluded when the taking is effected, then the plaintiff's remedy is by action against the canal company, by whose act the plaintiff was deprived of his property, and not against its lessee.

As early as 1830, it was held by Chief Justice Ewing, in *Kough* v. *Darcy*, 6 *Halst.* 284, that the charter empowered the company to enter upon and take possession of and use lands and water-rights necessary for its canal, without compensation first made, and without becoming a tort-feasor thereby,

subject to the owner's right to recover compensation for his injury, and to resort to legal proceeding to obtain recompense for damages to his lands, tenements, hereditaments and water rights, by the erection of the canal.

This construction was adopted and made the basis of decision in *Den* v. *Morris Canal*, 4 *Zab.* 587. That case was decided expressly on the ground that the possession of lands taken by the company for its canal was not unlawful. Mr. Justice Elmer, in delivering the opinion of the court, quotes from the opinion of Chief Justice Ewing in Kough v. Darcy, and adopts his reasoning. He says : "Chief Justice Ewing, delivering the opinion of the court, remarks that this section (Section 20) embraces all persons who may sustain injury, by actual occupation or otherwise, and covers the same extent of damages, right and estate which are provided for, and which may be satisfied by or vested in the company, by virtue of the previous sections ; it is therefore one of the modes of compensation directed by the act. Authority being thus given to the company to take possession of and use the requisite land, subject to being sued by the proprietor for such damages as he thereby sustained, including the taking from him his estate therein, unless he thought proper to agree upon the proper compensation or to await an assessment, it follows as a necessary construction that the taking and using was meant to be absolute, and not subject to be afterwards disturbed ; the taking and using subjected the company to be called upon for compensation, at the option of the proprietor, to the whole extent of the injury done to his possession and estate, by means of a suit at law."

It is evident that the legislative purpose, as expressed in the twentieth and twenty-seventh sections, was to secure to persons injured in their property-rights, a remedy in conformity with the ordinary rules regulating actions at law, according to the nature and extent of the injury sustained. If the injury be one that in its nature is temporary and recurrent, such as might arise from the company's negligence in allowing its works to be out of repair, or from the temporary

diversion or throwing back of water, arising from the irregular supply of water from extraneous sources, or the management of the gates of the canal locks, or from the occasional use of flash boards as a temporary expedient, successive actions for the damages sustained from time to time may, under the circumstances, be the appropriate remedy.

But when the company has effected a complete appropriation of property by the location of its canal on lands, or the appropriation of water-rights to its use by the construction of works designed to effect a constant and continuous diversion or flooding back of waters, such lands and water-rights are taken, and the damages consist in the entire value of the property taken. If, as has been conclusively adjudged, the company may take and appropriate property to its use without compensation first made, and its possession and use thereof be therefore lawful, there is no principle of law regulating actions and pleadings that will sustain an action, the very foundation of which is, that the possession or use of property without such compensation being made is a legal wrong. The twenty-seventh section gives no countenance to such an action. It extends the right of action, reserved by the twentieth section, to damages sustained not only by the erection of the canal in the first instance, but also by the subsequent operations of the company from time to time as the same may arise. The damages are sustained by the owner when his property is appropriated by the company to its use as a finality, and do not arise from time to time, from the occupation or use of it by the company.

This construction is in harmony with the course of decision on this subject in the courts of this state. It has been uniformly held that, in proceedings to condemn, the value of the lands and damages are to be appraised as of the time when they were taken, though the title may not pass until the appraised value is paid. In *North Hudson R. R. Co.* v. *Booraem*, 1 *Stew.* 450, it was held by this court that, where a railroad corporation having power to condemn, entered into possession and constructed its road upon the land, in proceed-

ings subsequently prosecuted to condemn, the measure of compensation was the value of the land and damages at the time the entry was made, and interest from that time. In *Trenton Water Power Co.* v. *Chambers*, reported in 1 *Stockt.* 471, and 2 *Beas.* 199, the company entered into possession of lands by consent of the owners and constructed its canal upon them, and the order of the Chancellor was that the master should make an estimate and appraisement of their value and the damages as of the time when possession was taken. The rule is general that the assessment should be of the value at the time of the taking, although the statute provides that title should not pass until compensation is paid. *Mills on Eminent Domain*, §§ 174, 176.

The canal company is, by its charter, admitted into the possession of property required for its use, by the sovereign power of the legislature. If, after possession taken, proceedings are instituted for an appraisement thereof, pursuant to the sixth section, the value of the property, when it was taken and appropriated to the company's use, and interest, would be the measure of compensation to be awarded by the commissioners. It is clear that the same measure of compensation will be recoverable in an action by the owner under the twentieth section; for, the possession and continued use of the property being made lawful, the damages to the owner's lands, tenements, hereditaments or water-rights, which he sustained by the erection of the canal, would be such as resulted from the complete appropriation of his property to the company's use, and the entire deprivation of all beneficial interest therein, and be equivalent to the whole value of the property at the time the owner was deprived of it by the company's entry upon it.

Any other view of the rights of the company and of the owners of lands and water-rights than that the injury is completed when the property has been taken and appropriated by the company to its use, and that the damages recoverable by the owner in his action will be the whole value of the property he has lost by the company's act, would work great in-

justice to the owners of property required by the company for its use. The owner to whom compensation has not been made cannot oust the company from the premises by ejectment. He cannot set on foot proceedings for the estimation of his damages by commissioners, under the sixth section of the company's charter, nor can he treat its possession and use as tortious, so as to visit upon the company punitive damages, by means of which to force the company to institute and carry into effect proceedings for the appraisement by commissioners of the value of his lands or water-rights. If he cannot recover the entire damages he has sustained in one action, and is remitted to repeated actions for damages *pro tanto* for the occupation or use of his property, the charter has placed him in the situation of permanently investing his property in the canal, from which the income derived will be the proceeds of repeated suits for damages, instead of enabling him to recover at once full compensation for the injury sustained. If the property should be land on which the canal is located, or consist of an improved mill-site rendered valueless by the diversion or throwing back of water, it is manifest that successive actions for use and occupation or for the loss and inconvenience suffered from the deprivation of the beneficial use and enjoyment of his property, besides being vexatious, would afford the owner no adequate recompense for his injuries. He could not improve or repair the improvements which gave value to his property when it was interfered with, for reparation and improvement, if practicable, would be a useless expenditure of money, for which he could make no claim to be reimbursed; nor could he suffer his property to fall into decay, for to suffer it to fall into decay, would deprive him of the ability to obtain compensation as he sought it from time to time, on the basis of the improvements in which its value intrinsically consisted, when his property was invaded by the company.

In all cases where property, whether it be lands or water-rights, has been permanently appropriated by the company to its use, the damages sustained are a unit, and are recoverable

as such, and not by piecemeal. The injury is consummated when the company has permanently appropriated the owner's lands or water-rights to its use; and, as was said by Chief Justice Ewing, in Keough v. Darcy, "the right of action for such damages is not by anything in the act impaired, not weakened, not lessened, not even postponed to an indefinite period, for so to postpone is manifestly to impair."

It is clear, I think, that the action reserved by the charter, to the owner for damages to his or her water-rights, lands, tenements or hereditaments, is the means provided for him to obtain an appraisement and recovery of his damages, in case the company does not proceed to obtain an appraisement of them by commissioners. It will follow, therefore, that the damages recoverable in such action will be the same compensation which is determinable by the award of commissioners—full compensation for the injury done by the appropriation of the owner's property to the company's use; for the property being taken when it is appropriated by the company to its use, the extent of the injury will not depend upon the method adopted to determine the compensation due the owner of it. It will also follow from the substitution of an action by the owner for proceedings to appraise by commissioners, that the owner's action for compensation will not be barred by the statute of limitations, as ordinary actions of trespass or for debts are barred. He may proceed to have his damages appraised by action at any time before a right or title to the property has been acquired by adverse user or possession. Nor will his claim for damages be subject to a presumption of payment, such as is sometimes applied to debts, for until his damages are ascertained by action or by the award of commissioners, there is no debt to which a presumption of payment can apply.

The decisions of the Supreme Court in *Morris Canal* v. *Seward*, 3 *Zab.* 219, and in *Ryerson* v. *Morris Canal*, 3 *Dutcher* 457, 4 *Id.* 97, are not in conflict with the views here expressed.

In the Seward case the company had obtained the right to

flow the plaintiff's lands by condemnation. To prosecute such proceedings the sixth section of its charter provides that the company should cause a survey and map to be made of the lands, waters and streams required. The complaint was that more lands were overflowed than were embraced in the proceedings to condemn. The court held that the survey and map indicated what lands the company proposed to take, and that, if it overflowed more lands than were embraced in the proceedings to condemn, the company was bound to pay for them, and that the owner was entitled to an action for the same.

In the Ryerson cases the company claimed a right to maintain its dam, and overflow the plaintiff's lands by virtue of a deed of grant.

In the case as reported in 3 *Dutcher*, the gravamen of the action was an injury to the plaintiff's lands resulting from the company's neglect to keep its dam and embankments in repair.

In the second of the Ryerson cases, as reported in 4 *Dutcher*, which is a precedent more nearly applicable to this case, the ground of complaint was that the company maintained its dam at a height not warranted by the grant. The company made no claim of a taking beyond the description in the grant, and *non constat*, that it intended to take permanently beyond the purview of the grant. The construction of the grant was the sole point in litigation. The form of action and the incidents and obligations arising from a taking without consent of the owner and without compensation made, were not discussed or considered. It is true that the eminent jurist who pronounced the opinion of the court, assigned as a reason for setting aside the verdict, that by it the dam was pronounced a continuing nuisance. But it is improbable that the learned Chief Justice intended to disapprove of the opinion of Chief Justice Ewing in Keough v. Darcy, and to overrule the decision of the court in Den v. Morris Canal, in which he took part, without a mention of those cases and a re-examination of the reasoning on which the latter case was rested.

It appears also from an inspection of the pleadings in the Seward and Ryerson cases, that they embraced only the damages accruing between certain specified days. But if the parties saw fit to· make up and try, without objection, an issue on the theory that the injury complained of· was a temporary injury, not resulting from a permanent devotion of the owner's property to the company's use by an absolute taking of it, the court was not called upon to consider or determine any other issue. The record upon such an issue could have no other or greater effect.

On the theory on which the Seward and Ryerson cases were tried, that there had been no permanent taking of property, and only a temporary injury to it, the action and the pleadings in those cases were in proper form. The company is empowered by its charter to take property, lands and water-rights, for its use, without compensation first made, and without becoming a tort-feasor thereby. But any invasion of property short of an absolute taking, is an injury, redressible by the same form of action and pleadings therein by which any unjustifiable injury to property is redressible.

In the present case, it is a fact indisputable that there was a taking either in 1845, in 1857 or in 1875. The pleadings in the plaintiff's action are not adapted to such a state of the case, and the defendant is under no obligation to submit to the vexation of successive suits upon a cause of action which is an entirety, single and indivisible. Furthermore, if the taking was in 1845 or in 1857, or at any time before the defendant's lease was made in 1871, the plaintiff has misconceived his remedy. His action should then have been against the canal company, by whom his property was taken and the plaintiff's injury was done. It should have been left to the jury to determine whether the taking was before or after the defendant became the lessee of the canal and its works.

The defendant also contended at the trial that the right to maintain its dam at its present height had been acquired by adverse enjoyment. If the defendant, or the canal company, under whom it claims, has acquired the right in dispute by

prescription, the subject already discussed becomes of no importance in this litigation. It will be necessary, therefore, to examine the instructions of the judge on this head.

The instruction was, in substance and effect, that mere verbal protests and denial of the right, without any interruption or obstruction in fact, of the enjoyment of the right, would prevent the acquisition of an easement by adverse user. This instruction follows the opinion of the Vice-Chancellor, in *Lehigh Valley R. R. Co.* v. *McFarlan*, 3 *Stew.* 180.

At common law there was no fixed period of prescription. Rights were acquired by prescription only when the possession or enjoyment was "time whereof the memory of man ran not to the contrary." By 20 *Hen. III.*, c. 8, the limitation in writs of right dated from the reign of Henry II. By 3 *Ed. I.*, c. 39, the limitation was fixed from the reign of Richard I. By 21 *Jac. I.*, c. 16, the time for bringing possessory actions was limited to twenty years after the right accrued. These statutes applied only to actions for the recovery of land ; none of them embraced actions in which the right to an incorporeal hereditament was involved. But by judicial construction an adverse user of an easement for the period mentioned in the statutes, as they were passed from time to time, became evidence of a prescriptive right; and finally, the fiction was invented of a lost grant, presumed from such user to have once been in existence and to have become lost. The fiction of a lost grant seems to have been devised after the statute of James. It was called a lost grant, not to indicate that the fact of the existence of the grant originally was of importance, but to avoid the rule of pleading requiring profert. Allegation of the loss of the grant excused profert and bringing the instrument into court.

Whatever strictures may have been made upon this method of judicial legislation, the fiction has been promotive of beneficial results, and forms the basis of prescriptive titles, and it is now too late to question the validity of its introduction. The doctrine of lost grant forms part of the law of the land, and any dislike which may be felt for this and like fictions

cannot be allowed to interfere with the carrying out of the doctrines involved in them to the full extent, which has been sanctioned by established authority. *Angus* v. *Dalton*, 4 *Q. B. D.* 161, *per Thesiger, L. J.*

At a very early period it was held that when by the statute of limitations the seizin in a writ of right was limited to the time of Richard I., although a man might prove to the contrary of a thing whereof the prescription was made, yet this should not destroy the prescription if the proof was of a thing before the said time of limitation. 2 *Roll. Abr.* 269; 17 *Vin. Abr.* 272, *"Prescription," M.* Afterwards, when the fiction of a lost grant was devised, there arose considerable diversity and fluctuation in judicial opinions as to whether an uninterrupted user for the period of limitation conferred a legal right or raised merely a presumption of title which would stand good until the presumption was overcome by evidence which negatived, in the judgment of juries, the existence of a grant. This state of the law produced great insecurity to titles by prescription, and subjected such rights to the whim and caprice of juries. This evil was remedied by the later English authorities, which gave to the presumption of title arising from an uninterrupted enjoyment of twenty years the most unshaken stability, and made it conclusive evidence of a right. 3 *Kent* 445. The judicial expression of opinion in England nearest to the time of the separation of the colonies from the mother country, is that of Lord Mansfield, in *Cowper* 215, where he says that effect is given to the presumption, "not that in such cases the court really thinks a grant has been made, because it is not probable a grant should have existed without its being upon record, but they presume the fact for the purpose and from the principle of quieting the possession." The question has been set at rest in England by the statute 2 and 3 *William IV.* But no one can examine the English cases for half a century preceding the statute, without observing that the statute in its main features was simply declarative of the law as expressed by the great weight of judicial opinions.

In this country the prevailing doctrine is, that an exclusive

and uninterrupted enjoyment for twenty years creates a presumption, *juris et de jure*, and is conclusive evidence of title whenever, by possibility, a right may be acquired by grant.

In the class of legal presumptions established by judicial decisions which have become part of the common law of the land, and are imperative rules of law against the operation of which no averment or evidence is received, Prof. Greenleaf classes the presumption of a grant arising from an exclusive and uninterrupted enjoyment for the period of prescription. 1 *Greenl. Ev.*, § 17. He also says that, by the weight of authority, as well as the preponderance of opinion, it may be stated as the general rule of the American law, that an enjoyment of an incorporeal hereditament, adverse, exclusive and uninterrupted for twenty years, affords a conclusive presumption of a grant or a right, as the case may be, which is to be applied as a *presumptio juris et de jure*, wherever by possibility a right may be acquired in any manner known to the law. 2 *Greenl. Ev.*, § 539. This passage is quoted and adopted by another distinguished writer on American law, as a correct exposition of the law on the subject. 2 *Washb. on Real Prop.* 449. This doctrine has the support of Mr. Justice Story, in *Tyler* v. *Wilkinson*, 4 *Mason* 397, and is approved and enforced by Justices Wilde and Putnam, in the two leading cases of *Coolidge* v. *Larned*, 8 *Pick.* 503, and *Sargeant* v. *Ballard*, 9 *Id.* 251.

The difference between the English law, in the state it had reached before the statute 2 and 3 *William IV.*, and the American law, is slight. In England the presumption was dealt with as a presumption of fact; but for all practical purposes, it was a legal presumption, as it depended on pure legal rules. Coolidge *v.* Larned, per Putnam, J. Though the evidence of enjoyment was, in theory, presumptive evidence only of prescription, yet it was, in practice and effect, conclusive. *Gale on Eas.* (95), 149. At last the English Court of Appeals held that the presumption arising from the uninterrupted enjoyment of an easement, operated as an estoppel by conduct, not conclusive, so far as to exclude denial or explanation of the

conduct, but a bar to any simple denial of the fact, which is a mere legal inference drawn from such conduct; and consequently that the circumstance that no grant of the easement had been made was not material. *Angus* v. *Dalton*, 4 *Q. B. Div.* 162.

In this state the law may be considered as settled in accordance with the prevailing doctrine in the courts of this country. In *Campbell* v. *Smith*, 3 *Halst.* 143, Chief Justice Ewing, speaking of a right acquired by adverse user, says : "Statutes of limitation prescribing the time within which an entry shall be made into lands, tenements or hereditaments, and within which every real, possessory, ancestral, mixed or other action for any lands, tenements or hereditaments shall be brought, are not deemed to comprehend in terms, and within their purview, the right now under consideration; but, upon the wise principle of such statutes, and in analogy to them, to quiet men's possession, and to put an end and fix a limit to strife, a rule is established that, after the lapse of the period mentioned in those statutes, a grant will be presumed, not, says Lord Mansfield, (*Cowper* 214,\*) that in such cases the court really thinks a grant has been made, but they presume the fact for the purpose of and from a principle of quieting the possession. The period of twenty years is settled in England, according with the time mentioned in the statute of 21 *Jac. 1.* Our statute prescribing a like period, our rule is the same." This passage was quoted by Chancellor Vroom, in *Shreve* v. *Voorhees*, 2 *Green's Ch.* 32, as a correct expression of the law of New Jersey. The same principle was adopted by Chancellor Pennington, in *Shields* v. *Arndt*, 3 *Green's Ch.* 247 by Chancellor Zabriskie, in *Carlisle* v. *Cooper*, 4 *C. E. Green* 259, and by the Supreme Court, in *Wood* v. *Hurd*, 5 *Vroom* 87. In the case last cited, Mr. Justice Van Syckel, in discussing the kindred subject of a dedication to the public acquired by user, says that "mere acquiescence for twenty years, unaccompanied by any act which repels the presumption of such intention" (to dedicate) "is conclusive evidence of abandonment to the public."

---

\* Eldridge *v.* Knott.

The owner of the servient tenement cannot overcome the presumption of right arising from an uninterrupted user of twenty years, by proof that no grant was in fact, made. He may rebut the presumption by contradicting or explaining the facts upon which it rests; but he cannot overcome it by proof in denial of a grant. He may show that the right claimed is one that could not be granted away, or that the owner of the servient tenement was legally incapable of making, or the owner of the dominant tenement incapable of receiving such a grant. *Rochdale Canal* v. *Radcliffe*, 18 *Q. B.* 287; *Ellwell* v. *Birmingham Canal*, 3 *H. of L.* 812; *Staffordshire Canal* v. *Birmingham Canal*, *L. R.*, 1 *H. of L.* 254; *Thorpe* v. *Corwin*, *Spenc.* 312. He may explain the user or enjoyment by showing that it was under permission asked and granted; or that it was secret and without means of knowledge on his part; or that the user was such as to be neither physically capable of prevention nor actionable. *Chasemore* v. *Richards*, 7 *H. of L. Cas.*, 349; *Webb* v. *Bird*, 13 *C. B.* (*N. S.*) 841; *S. C.*, 10 *C. B.* (*N. S.*) 268; *Sturges* v. *Bridgman*, 11 *Ch. Div.* 852. But if there be neither legal incompetency nor physical incapacity, and the user be open and notorious, and be such as to be actionable or capable of prevention by the servient owner, he can only defeat the acquisition of the right on the ground that the user was contentious, or the continuity of the enjoyment was interrupted during the period of prescription.

In defining title by prescription, Sir Edward Coke says, both to customs and prescriptions, these two things are incidents inseparable, viz., possession or usage and time. Possession must have these qualities: It must be long, continual and peaceable; long, that is, during the time defined by law; continuous, that is, that it may not have been lawfully interrupted; peaceable, because if it be contentious and the opposition be on good grounds, the party will be in the same condition as at the beginning of his enjoyment. *Co. Lit.* 113 *b.* By a long course of decision, the word "interrupted," when applied to acts done by the servient owner, has received a

fixed meaning as indicating an obstruction to the use of the easement, some act of interference with its enjoyment, which, if unjustifiable, would be an actionable wrong.  This meaning has been given to the word as used in the statute 2 and 3 *William IV.*, (Parke, B., in *Olney* v. *Gardner*, 4 *M. & W.* 495,) and is its usual signification.

Sir Edward Coke gives no illustration of what was meant by contentious, except " opposition on good grounds," and by a quotation from Bracton, who wrote in a primitive era of English law, before the doctrine of prescription, as applied to incorporeal hereditaments, had been subjected to the formative processes of judicial expositions from which the present state of the law is derived.   The expression " opposition on good grounds" implies an act which would afford an opportunity to submit its validity to the test of judicial decision, and is more consistent with the idea of an interference with the enjoyment of the right, such as would give the owner ability to go into court and establish his right, than with the supposition that prescriptive rights should be forever kept in abeyance by acts which gave persons claiming them, no power by suit at law to establish the right.   In the passage quoted by Coke from Bracton, this early writer says :   " I use the term peaceable, because if it be contentious, it will be the same as before, if the contention has been just; as if the true lord forthwith, when the intruder or disseizor has entered into seizin, endeavors soon and without delay (if he should be present, or if absent when he shall have returned,) to repel and expel such persons by violence, although he cannot carry out to its effect what he has commenced, provided, however, when he fails he is diligent in requesting and in pursuing." *Bract., fols.* 51, 52. Mr. Goddard, in discussing an enjoyment which is not peaceable, defines *vi* in the phrase *vi clam aut precario*, to mean violence or force and strife, or contention of any kind; and the illustration he gives is where the enjoyment has been during a period of litigation about the right claimed, or the user has been continually interrupted by physical obstacles placed with a view of rendering user impracticable.   *Goddard on*

*Eas.* 172. In the English cases, peacefulness and acquies--cence (when the servient owner knows or might have known that a right is claimed against his interest) are used indifferently as equivalent to uninterrupted.

In this country several decisions have been referred to as holding that prohibitions, remonstrances and denials of the right by the owner of the servient tenement, unaccompanied by any act of interference with the enjoyment of the easement, will prevent the acquisition of the right. These cases are a legitimate outcome of the doctrine that the presumption is not a presumption *juris et de jure*, but is a presumption merely, liable to be rebutted by the proof of circumstances overcoming the presumption of a grant. This doctrine is supposed to have its chief support in *Powell* v. *Bagg*, 8 *Gray* 441.

In Powell *v.* Bagg, proof that the owner, when on the land, forbade the party claiming an easement of the flow of water over his premises to enter, and ordered him off, while there for the purpose of repairing the aqueduct, was adjudged to be competent evidence of an interruption, and an instruction that words, however strongly denying the right claimed or forbidding its exercise unaccompanied by any act or deed, was not an interruption of the user or enjoyment, was held to be defective and tended to mislead the jury. The evidence before the trial court is not fully reported. Evidence that the owner of the land forbade the other party to enter, and ordered him off, was undoubtedly competent as part of the plaintiff's case. Whether what occurred at that time would amount to an interruption of the easement, would depend upon circumstances, upon the conduct of the party when forbidden to enter or when ordered off. If the owner of the servient tenement, being on the premises, forbids the owner of the easement to enter for the purpose of enjoying it and orders him off, and the latter, on a well-grounded apprehension that the former means to enforce obedience to his commands, desists and withdraws, an action on the case for disturbance of the right would lie. This view must have been present in the mind of the

court, else why restrict the prohibition to place—on the land? To give certainty to the owner's purpose? A prohibition delivered elsewhere might be so vehement and emphatic as to leave the denial of the right equally beyond a doubt. On any other view of the case, as was said in *C. & N. W. R. R. Co.* v. *Hoag*, 90 *Ill.* 340, "the circumstances of the place where the forbiddance was made, whether on or off the land, would be immaterial." If facts such as are above indicated, appeared in the case, the charge was, in the language of the court, "defective, and tended to mislead the jury in applying the evidence to the rule of law upon which the title of the defendant to the easement rested." Certain expressions from the opinion have been quoted as indicating that a verbal denial of the right will operate, *ipso facto*, to determine the right. If that view be adopted, or the suggestion of Mr. Justice Woodbury, (3 *Woodb. & M.* 551,*) that complaints and the taking of counsel against such encroachments will bar the right, be followed, it is obvious that rights by prescription will be of little value.

None of the authorities cited by the learned judge in Powell v. Bagg, goes to the extent contended for. The passage quoted from Bracton, that an easement will be acquired by its exercise under a claim of right *per patientiam veri domini qui scivit et non prohibuit sed permisit de consensu tacito*, is followed by the comment that sufferance is taken for consent, and that if the lord of the property, through sufferance, has, when present and knowing the fact, allowed his neighbor to enjoy on his estate a servitude for a long time peaceably and without interruption from such enjoyment and sufferance, there is a presumption of consent and willingness. *Bract., lib.* 2, *c.* 23, § 1. In the passage referred to in Greenleaf, the language is that the user must be adverse—that is, under a claim of title—with the knowledge and acquiescence of the owner of the land, and uninterrupted. 2 *Greenl. Ev.*, § 539. In *Sargent* v. *Ballard*, 9 *Pick.* 254, 255, Weld, J., in discussing the methods by which a claim of title by prescription may be controverted by disproving the qualities and ingredients of such

---

* Stillman *v.* White Rock M'f'g. Co.

a title, says that "evidence might be given to prove that the use had been interrupted, thereby disproving a continued acquiescence of the owner for twenty years." In *Arnold* v. *Stevens*, 24 *Pick.* 112, the plaintiffs' claim was of a right to dig ore under a grant by deed. They had not exercised the right for forty years. In the meantime the owner had occupied and cultivated the surface of the land. The court held that there was no enjoyment hostile to the easement, for the owner of the land had done "nothing adverse to the rights of the owners of the easement—nothing to which they could object, or which would apprise them of the existence of any hostile claim, and no acquiescence, therefore, existed from which a conveyance could be presumed." In *Monmouthshire Canal Co.* v. *Harford*, 1 *C., M. & R.* 614, evidence was given of applications made on behalf of the claimants of the easement for permission to exercise the right. The court held that permission asked for and received was admissible to show that the enjoyment was not of right nor continuous and uninterrupted, for "every time the occupiers asked for leave they admitted that the former license had expired, and that the continuance of the enjoyment was broken." In neither of these cases was the effect of verbal remonstrances or complaints, as evidence of an interruption of enjoyment, considered.

Nor do the additional English cases cited by plaintiff's counsel in his brief meet the point under consideration. In *Livett* v. *Wilson*, 3 *Bing.* 115, it is stated in the report that "as to undisputed use of the way there was conflicting testimony, but the weight of the evidence showed that the alleged right had been pretty constantly contested, and the defendant, upon recently taking some adjoining premises, the approach to which by the entrance he claimed into the yard, said "my right of way from the street to the yard can *now* no longer be resisted." The character of the acts of resistance does not appear in the report of the case, either in 3 *Bing.* or in 10 *Moore*—whether they were verbal complaints or physical resistance. I do not find in either report of the case any war-

rant for the assertion of Tucker, P., (*Nichols* v. *Aylor*, 7 *Leigh* 565,) that "repeated complaints and denials of the title of his adversary were considered as sufficiently rebutting the presumption of a grant." The only pertinency this case has to the subject now considered, arises from the manner in which the case was left to the jury. The judge left to the jury to find whether or not the right had been granted by deed, instead of submitting to them the questions of fact upon which the law presumes a grant. I agree that, if the issue upon such a claim of right is whether a deed in fact has been made, proof of verbal complaints on or off the *locus in quo*, as well as proof that no deed in fact was made during the continuance of the user, would be admissible and competent evidence; and such evidence would generally determine the issue. But this method of leaving the question to juries has been condemned by the English courts, and is at variance with the doctrine generally received by the courts of this country.

In *Olney* v. *Gardner*, 4 *M. & W.* 495, the decision was that, where there was unity of possession of the dominant and servient tenements, the time during which such possession was continued must not only be excluded in the computation of the twenty years, but destroyed altogether the effect of the previous possession by breaking the continuity of enjoyment. In *Bright* v. *Walker*, 1 *C., M. & R.* 211, it was held that, as against the reversioner, the enjoyment of an easement during a tenancy for life was not to be reckoned as part of the prescriptive period.

*Eaton* v. *Swansea Water Works*, 17 *Q. B.* 267, was an action for disturbance of a water-course claimed by adverse user. The court held that interruptions, though not acquiesced in for a year under statute 2 and 3 *William IV.*, might show that the enjoyment was never of right, but was contentious throughout; and there being evidence that the owner of the servient tenement was in the habit of stopping up the trench whenever it was made, the neglect of the judge to answer a question propounded by a juror as to what would be the effect in law of a state of perpetual warfare between the

parties was not a satisfactory method of leaving the case to the jury. In *Tickle* v. *Brown*, 4 *A. & E.* 369, it was held that the words "enjoyed by any person claiming a right," and "enjoyment thereof as of right," in the statute, meant an enjoyment had not secretly, or by stealth, or by tacit sufferance, or by permission asked from time to time on each occasion or on many, and that, therefore, proof of a parol license was competent to show that the enjoyment was permissive, and not under a claim of right. The other two English cases referred to (*Benneson* v. *Cartright*, 5 *B. & S.* 1 ; *Glover* v. *Coleman*, *L. R.*, 10 *C. P.* 108,) were simply interpretations of section 4 of the statute 2 and 3 *William IV.*, and are not authorities with respect to the principles upon which prescriptive rights are acquired or prevented at common law. In each of the cases there was an actual physical obstruction of the user, and these cases turned upon the meaning of the words "submitted to or acquiesced in," contained in section 4, which provided that no act or matter should be deemed an interruption unless it should have been submitted to or acquiesced in for one year. Mr. Goddard, writing after all these cases were decided, in his excellent treatise, says : "It is commonly said that no easement can be acquired by prescription if the user has been enjoyed *vi clam aut precario*. The word *vi* does not simply mean by violence or force, but it means also by strife or contention of any kind—as, for instance, that the enjoyment has been during a period of litigation about the right claimed, or that the user has been continually disputed and interrupted by physical obstacles placed with a view of rendering the user impracticable." *Goddard on Eas.* 172.

I have not discovered in the English cases any intimation that mere denials of the right, complaints, remonstrances, or prohibitions of user, will be considered interruptions of the user of an easement, or as indicating that the enjoyment of it was contentious. On the contrary, whenever the subject has been mentioned, it has elicited expressions of marked disapprobation of such a proposition. This is conspicuously appar-

ent in the opinions of Bayley, J., in *Cross* v. *Lewis*, 2 *B. & C.* 689; of Lush, J., in *Angus* v. *Dalton*, 3 *Q. B. D.* 85; and of Thesiger and Cotton, Lords Justices, in the same case, as reported in 4 *Q. B. D.* 172, 186. Thesiger, L. J., in considering the nature of the evidence which shall contradict, explain or rebut the presumption of right arising from an uninterrupted possession of twenty years, says that it is "not sufficient to prove such circumstances as negative an actual assent on the part of the servient owner, or even evidence of dissent short of actual interruption or obstruction to the enjoyment." In Angus *v.* Dalton, the easement was not such as came within the statute 2 and 3 *William IV.;* and the case was discussed and decided upon the principles of the common law, independently of the statutory provision.

Some confusion on the subject has arisen from the failure to discriminate between negative and affirmative easements; negative easements, such as easements of light, and of the lateral support of buildings, which cannot lawfully be interrupted except by acts done upon the servient tenement; and affirmative easements, such as ways and the overflowing of lands by water, which are direct interferences with the enjoyment by the servient owner of the premises, and may be the subject of legal proceedings as well as of physical interruption. This distinction is pointed out by the court in *Sturges* v. *Bridgman*, 11 *Ch. D.* 852. In Angus *v.* Dalton, the Queen's Bench decided that the negative easement of lateral support of buildings could not be acquired by prescription, for the reason that the owner of the adjoining premises had no power to oppose the erection of the building and no reasonable means of resisting or preventing the enjoyment of its lateral support from his adjoining lands. But this decision was overruled in the Court of Appeals. *Angus* v. *Dalton*, 3 *Q. B. D.* 85; 4 *Id.* 162. With respect to such an easement there is great force of reasoning in the contention that slight acts of dissent should avail to defeat the acquisition of a right; for it would be unreasonable to compel the owner of the adjoining lands to dig down and undermine the foundations or

Lehigh Valley R. R. Co. v. McFarlan.

to put him to legal proceedings *quia timet* to preserve domin-
ion over his property. But no such considerations of hardship
or inconvenience exist when the easement is a right of way,
which, whenever the right is exercised, is a palpable invasion
of property and may easily be obstructed, or is an easement of
flooding lands, which is really, though not technically, a dis-
seizin *pro tanto*, and can easily be interrupted.*

The whole doctrine of prescription is founded on public
policy. It is a matter of public interest that title to property
should not long remain uncertain and in dispute. The doc-
trine of prescription conduces, in that respect, to the interest
of society, and at the same time is promotive of private justice
by putting an end to and fixing a limit to contention and
strife. Protests and mere denials of right are evidence that
the right is in dispute, as distinguished from a contested right.
If such protests and denials, unaccompanied by an act which
in law amounts to a disturbance and is actionable as such, be
permitted to put the right in abeyance, the policy of the law
will be defeated, and prescriptive rights be placed upon the
most unstable of foundations. Suppose an easement is en-
joyed, say, for thirty years. If after such continuance of

---

\* Note.—Since this opinion was prepared, the decision of the Court of
Appeals in Angus *v.* Dalton, has been affirmed in the House of Lords.

The appeal was heard in the presence of Pollock, B., Field, Lindley,
Manisty, Lopes, Fry and Bowen, JJ.

The whole subject of prescriptive rights was exhaustively discussed by
the judges and by the law lords.

These extracts are pertinent to the subject above discussed.

Pollock, B., speaking of the language used by Lush, J., in his ruling at
the trial, viz., "I think it has become absolute law that, where a building
has stood for twenty years supported by adjacent soil, it has acquired a
right to the support of the soil," says: "On behalf of the plaintiff, it was
argued before your Lordships that this must be taken as a rule of law not
resting upon fiction, or upon implied grant, but as a right of property,
namely, an enjoyment of support, which after twenty years, becomes inde-
feasible in the same manner as the occupier of land may, by bare posses-
sion for a sufficient period of time, acquire a good title. \* \* \* The
proposition thus asserted, appears to me to put the right of the plaintiff
upon a reasonable foundation, and if affirmed by your Lordships it would
lay down an intelligible rule of law freed from difficulties which obviously

Lehigh Valley R. R. Co. v. McFarlan.

enjoyment the right may be overthrown by proof of protests and mere denials of the right, uttered at some remote but serviceable time during that period, it is manifest that a right held by so uncertain a tenure will be of little value. If the easement has been interrupted by any act which places the owner of it in a position to sue and settle his right, if he chooses to postpone its vindication until witnesses are dead or the facts have faded from recollection, he has his own folly and supineness to which to lay the blame. But if by mere protests and denials by his adversary, his right might be defeated, he would be placed at an unconscionable disadvantage. He could neither sue and establish his right, nor could he have the advantage usually derived from long enjoyment in quieting titles.

Protests and remonstrances by the owner of the servient tenement against the use of the easement, rather add to the strength of the claim of a prescriptive right; for a holding in defiance of such expostulations is demonstrative proof that the enjoyment is under a claim of right, hostile and adverse; and if they be not accompanied by acts amounting to a dis-

present themselves whenever, with a view consistently to uphold what, after all, is merely technical, it has been endeavored to rest the right in question upon a supposed actual grant which has been lost, or upon the production of evidence, great or small in degree, tending to show a supposed *de facto* acquiescence in the building of the house by the neighbor whose land supports it, either of which involves a supposition so improbable as to make it repugnant to good sense, and therefore one upon which it is most undesirable that judges and juries should act. * * * The presumption arising from twenty years' enjoyment cannot, no doubt, be treated as conclusive, that is, as a *presumptio juris et de jure*, which is not to be rebutted by evidence; it is conclusive only when the evidence of enjoyment is uncontradicted and unexplained."

Field, J., in his opinion, says: "If he" (*i. e.*, the owner of the servient tenement,) "do not by some act of interruption prevent it, the open continuance of this enjoyment by the adjoining owner for the requisite period of time, makes the building or windows to be 'ancient,' and converts the *de facto* enjoyment into a right. * * * Interruption of the enjoyment is the only mode by which the acquisition of this right can be prevented; nothing short of it is of any avail, and no actual assent is required to convert the lawful enjoyment into a right."

turbance of the right in a legal sense, they are no interruptions or obstructions of the enjoyment.

The instructions of the judge were erroneous in this respect. The jury should have been told that a continuous enjoyment under a claim of right for twenty years, not obstructed by some suable act, and having the other qualities of an adverse user, confers an indefeasible right. It is said that the instruction was given in view of evidence tending to show interruptions in fact of the right, and therefore the error was harmless. As the judgment will be reversed on other grounds, and the case may be retried, we prefer not to discuss the evidence at this time.

On the two exceptions considered here, we think the judgment should be reversed.

Exception was also taken to the charge of the judge refusing to exclude from the damages such as accrued during the term for which the plaintiff's premises were demised to other persons. The lease is dated June 2d, 1875. On the theory on which the plaintiff is entitled to an action for his injury, if the taking of his water-rights was before the lease was made, the subsequent demise was totally immaterial. In 1875, when the dam to its present height was made permanent, if not be-

---

Lindley, J., said: "The theory of an implied grant was invented as a means to an end. It afforded a technical common law reason for not disturbing a long-continued open enjoyment. * * * Express dissent, *i. e.*, an express protest, would no doubt negative assent; and if acquiescence by the owner of the servient tenement is essential to the acquisition of a right to lateral support, a protest by him ought to be sufficient to prevent its acquisition. But I can find no trace of any authority to the effect that a protest would suffice for that purpose in this case any more than in other cases more or less similar. * * * The only way in which I can reconcile the authorities on this subject, is to hold that a right to lateral support can be acquired in modern times by an open uninterrupted enjoyment for twenty years, and that if such an enjoyment is proved, the right will be acquired as against an owner in fee of the servient tenement, unless he can show that the enjoyment has been on terms which exclude the acquisition. Whether he has assented or not, even if he has dissented, appears to me immaterial, unless he has disturbed the continued enjoyment necessary to the acquisition of the right." *Dalton* v. *Angus,* 6 *App. Cas.* 740.

fore, there was indisputably a taking *pro tanto*. How early in 1875 this was effected does not distinctly appear. If, on a retrial, it shall appear that the taking was after the rights of the tenant accrued, so much of the damages as represent the tenant's injury can be excluded.

The other exceptions have been examined. It is sufficient to say that we find them without any legal support.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, DEPUE, DIXON, KNAPP, PARKER, REED, SCUDDER, COLE—9.