GEORGE SPOTTISWOODE v. THE MORRIS AND ESSEX RAILROAD COMPANY.

1. Section 16 of the act of 1874 (*Gen. Stat., p.* 1977, § 23) provides that "no person who now hath or hereafter may have any right or title of entry into any lands, tenements or hereditaments shall make entry therein but within twenty years next after such right or title shall accrue, and such person shall be barred from any entry afterwards." *Held*, that by force of this section possession held adversely uninterrupted for the period of twenty years will confer title, which is not lost by the subsequent entry of the adverse claimant, and will support an action of ejectment.

2. Title by adverse possession may be acquired as against a railroad company to lands obtained by the company for railroad purposes.

3. The Morris and Essex Railroad Company was incorporated in 1835, with the right to construct a railroad not exceeding sixty-six feet wide, with as many tracks and rails as the company might deem necessary, with the power to purchase or take lands by condemnation. The company located the route of its railroad over lands of G. G. made a deed to the company, in which, after reciting that the company had located its route over a certain described tract of land, beginning in line of lands of Cyrus Freeman, in the line of the centre stakes of the railroad, and from thence running parallel with the centre stakes of said road on a course north, &c., "so as to include a strip of land not to exceed two rods wide on each side of the said centre stakes," he granted and conveyed to the company and its successors the right to enter upon the said tract of land, take possession of, have, hold, use and excavate the same, and to erect embankments, bridges and all other works necessary to lay rails, and to do all other things which shall be suitable and necessary for the completion or repair of said road or roads. Shortly after the delivery of this deed, fences were erected on each side of the railroad distant from the centre line one rod and a half, and the company constructed a single-track railroad. By these fences the land set apart for the use of the company was delineated on the ground as a strip one rod and a half wide on each side of the centre line. On this strip the company laid a second track in 1887. These fences were maintained until 1891, when the company erected fences on each side of their railroad two rods from the centre line, and in 1892 laid a third track, occupying in part the strips of land now in controversy. This action was brought in 1895. At the time the suit was brought the company was in possession of the premises, and had been in possession since 1891. The company claims title to land two rods in width on each side of the centre line. The plaintiff claims title up to the line of the old fences. The plaintiff

makes title under G. From the time the first fences were erected there was an adverse possession on the part of G. and those who succeeded to his title down to 1891, upwards of fifty-five years. *Held*—

1. That title by adverse possession was acquired through G. and those who succeeded to his estate, and that such title vested in the plaintiff.

2. That that title was not divested by the entry of the company in 1891.

3. That the deed from G. to the company was not for premises with a definite description, but was a grant of the right to enter and construct a railroad thereon, and appropriate for that purpose a strip of land not to exceed two rods wide on each side of the centre stakes, and that the entry of the company in 1835 and the erection of the fences was a practical location of the grant, and that possession of the abutting owner continuing adversely for the time which by law conferred title, the company could not set up its rights under its charter to overcome the title which the plaintiff and those under whom he is in privity of estate acquired by adverse possession.

---

In ejectment. On rule to show cause.

On case tried in the Essex Circuit. Verdict for the plaintiff. Rule to show cause granted and case made and certified to this court for its advisory opinion.

Argued at November Term, 1897, before MAGIE, CHIEF JUSTICE, and Justices DEPUE, LUDLOW and GUMMERE.

For the plaintiff, *Hayes & Lambert.*

For the defendant, *Bedle, McGee & Bedle.*

The opinion of the court was delivered by

DEPUE, J. This was an action of ejectment brought by George Spottiswoode against the Morris and Essex Railroad Company to recover possession of two parcels of land situate in the city of Orange. Both parties claim title under Ezra Gildersleeve.

The Morris and Essex Railroad Company was incorporated January 29th, 1835. By the sixth section of the act of incorporation the company was authorized and invested with all

the rights and powers necessary to lay out and construct a railroad from Morristown to the city of Newark, not exceeding sixty-six feet wide, with as many sets of tracks and rails as the company might deem necessary, with the power to purchase or take lands by condemnation. *Pamph. L.* 1835, *p.* 25. The company located the route of its railroad over lands of Gildersleeve, situate in the townships of Clinton and Orange, now the city or Orange.

Gildersleeve, by a deed executed December 24th, 1835, granted and conveyed to the railroad company as follows:

" To all to whom these presents may come, I, Ezra Gildersleeve, of the township of Orange, New Jersey, send greeting :

" Whereas, ' The Morris and Essex Railroad Company,' in pursuance of the provisions of an act of the legislature of the State of New Jersey entitled 'An act to incorporate the Morris and Essex Railroad Company,' have surveyed a route for a railroad from the village of Morristown to intersect ' The New Jersey Railroad and Transportation Company' at Newark, in the county of Essex, which route has been laid over the following-described tract of land of the said Ezra Gildersleeve, situate in the townships of Clinton and Orange, in the county of Essex, and State of New Jersey.

" Beginning in the line of lands of Abner Crowell, in the township of Clinton, in line with the centre stakes of the track of the Morris and Essex railroad, and running from thence, in range with the said stakes, on a course north, thirty-six degrees east, about five chains, so as to include a strip of land one rod and a half wide on both sides of said centre stakes, containing about thirty-seven hundredths of an acre of land, more or less, and then beginning, *Second,* in line of land of Cyrus Freeman, the same being in the township of Orange, in line of the centre stakes of the railroad as aforesaid, and from thence, running parallel with the centre stakes of said road, on a course of north, thirty-six degrees east, *about* twenty chains across all the lands of the said Ezra Gildersleeve, in the township of Orange, *so as to include a strip of*

*land, not to exceed two rods wide, on each side of the said
centre stakes,* through any of the lands of the said Ezra Gil-
dersleeve, in the township of Orange.

" Now, be it known that the said Ezra Gildersleeve, in
consideration of the sum of one hundred dollars to him in
hand well and truly paid by the said ' The Morris and Essex
Railroad Company,' the receipt whereof is hereby acknowl-
edged, hath and by these presents *doth grant, bargain, sell,
convey* and confirm unto the said ' The Morris and Essex
Railroad Company,' and *to their successors forever, the right,
liberty and privilege of entering upon the tract of land above
described,* by its officers, agents, engineers, superintendents,
contractors, workmen and other persons in their employ, *and
to take possession of, hold, have, use, occupy and excavate the
same, and to erect embankments, bridges and all other works
necessary to lay rails, and to do all other things* which shall
be suitable or *necessary for the completion or repair of said
road or roads.*

" To have and to hold the said tract of land and premises
unto the said ' The Morris and Essex Railroad Company,'
and to its successors forever, for the purposes above men-
tioned and for all the other purposes mentioned in the said
act of incorporation."

This deed was recorded in the county clerk's office on the
20th of December, 1836. Upon the execution and delivery
of the deed the company constructed a single-track railroad
on the property described. This single track remained in use
until 1886 or 1887, when the company laid a second track,
making a double-track railroad.

The controversy in this case relates to the title of the rail-
road company through the tract secondly above described.
Shortly after the execution and delivery of this deed fences
were erected on each side of the centre line of the railroad,
distant from the centre line one rod and a half. By whom
these fences were erected does not distinctly appear. By
these fences the land apparently set apart for the use of the
railroad company was delineated on the ground as one rod

and a half wide on each side of the centre line of the railroad. The railroad company claims title to land two rods in width on each side of the centre line. The controversy between these parties is with respect to the strips of land on both sides of the railroad lying between these fences and a line ascertained by a measurement of two rods from the centre line.

The evidence shows that Gildersleeve remained in possession of the land on each side of this strip up to the fence. By his will, dated March 3d, 1846, and proved May 4th, 1846, he devised all of his real estate to his son, Cyrus, who, by a deed dated December 15th, 1852, and recorded March 23d, 1853, conveyed to Edwin G. Smith. The description in the deed from Cyrus to Smith for the premises conveyed embraced within its metes and bounds the entire premises occupied by the railroad company with an exception in these words: "Not including the Morris and Essex railroad." By deeds of conveyance from successive grantees the premises conveyed by Cyrus Gildersleeve to Edwin G. Smith became vested in George Spottiswoode, the plaintiff in this case.

There was evidence that these fences were built before the ground was graded, at least before the railroad was used, and that they were post and rail fences. They were so located as that they enclosed for the railroad a strip of land on each side of the centre stakes one rod and a half wide, making a strip of land for railroad purposes three rods in width. There was evidence also that the Gildersleeves used the land outside of these fences, on the west side, mostly for pasture, and on the east side mostly for cultivation. Lighthipe, who acquired title under Smith in 1855, testified that when he got his deed the fences were there on both sides of the railroad and were there all the while he was the owner. He also testified that he used part of the premises for pasture and part for cutting grass. A surveyor, who made a survey in 1869, testified that he found post and rail fences, and that they were one and a half rods from the centre line of the railroad, and that the fences, as found by him in 1869, were delineated in black lines on the map, a distance of one and a half rods from the

centre line of the railroad.   There was also evidence tending to prove that from the time these fences were erected along the line of the railroad until 1891 fences were maintained one rod and a half from the centre line.

In 1891 the railroad company erected fences on each side of their railroad two rods from the original centre line, and in 1892 a third track was laid, occupying in part the strips of land now in controversy.   This action was brought in 1895.   At the time this suit was brought the railroad company was in possession of the premises in question and had been in possession since 1891.

The evidence of possession from 1835 to 1891 by Ezra Gildersleeve and those who succeeded to his title was such, at least from 1852, the date of the deed from Cyrus Gildersleeve to Smith, as was adapted to establish an adverse possession by parties who were in possession under deeds of conveyance conferring color of title.

The trial judge left the questions of fact to the jury with instructions which expressed accurately the legal rules by which title may be acquired by adverse possession, and the verdict of the jury determined that issue. . The propriety of the verdict under the judge's instruction is not by the certificate submitted to this court.

The contention of the counsel of the defendant is that the doctrine of adverse possession is inapplicable to premises in the situation in which these premises were.   On the other hand, the contention is that by a practical location immediately after the execution and delivery of the deed by Ezra Gildersleeve to the company, and a possession in a legal sense adverse, the title became vested in the plaintiff.

Under this head, the first position assumed by the defendant's counsel is that a possession which is adverse in a legal sense for a period of twenty years will not give title, and that, the company being actually in possession of the premises when this suit was begun, the action cannot be maintained. The theory of this defence is that no man can acquire title to the lands of another without a continuous adverse possession

for sixty years or an original fair and *bona fide* purchase from a supposed owner accompanied by such possession for thirty years.    This contention is based upon sections 1 and 2 of the act of June 5th, 1787.    *Gen. Stat., p.* 1972.    The first section of this act enacts " that sixty years' actual possession of any lands, &c., uninterruptedly continued by occupancy, descent, conveyance or otherwise, in whatever way or manner such possession might have commenced or have been continued, shall vest a full and complete right and title in every actual possessor or occupier of such lands, &c., and shall be a good and sufficient bar to all claims that may be made or actions commenced by any person or persons whatever for the recovery of such lands," &c.    The second section provides "that thirty years' actual possession    *    *    *    uninterruptedly continued as aforesaid, *wherever such possession commenced, or is founded upon a proprietary right duly laid thereon* and recorded, &c., or wherever such possession was obtained by a fair, *bona fide* purchase    *    *    *    of any person or persons whatever in possession and supposed to have a legal right and title thereto,    *    *    *    *shall be a good and sufficient bar to all prior locations, rights, titles, conveyances or claims whatever,* not followed by actual possession as aforesaid, *and shall vest an absolute right and title in the actual possessor and occupier* of all such lands, tenements or real estate."

Possession obtained and held as prescribed by the first section of this act will confer a title paramount to the claims or rights of all other persons.    Such a possession will bar the issue in tail, as well as the tenant in tail, against whom it commenced its operation.    *Wright* v. *Scott,* 4 *Wash.* (*U. S.*) 16, 24.    Possession in conformity with the second section of the act will also confer a valid title, not only against the tenant in tail, but also all persons claiming by descent *per formam doni* through him.    *Croxall* v. *Sherrerd,* 5 *Wall.* 268, 287.    The section last referred to in using the words "all prior locations, rights, titles and conveyances or claims," in describing the title extinguished by such possession, re-

stricts the operation of that section to titles or claims in existence prior to the thirty years' possession, and consequently the statute under that section will not begin to run against a reversioner or remainderman until after the estate for life is terminated. *Pinckney* v. *Burrage,* 2 *Vroom* 21.

The first section of the act of 1787 does not apply to this case—the plaintiff making no title under a possession for sixty years. Nor is the second section of the act pertinent to the consideration of this case—a fair *bona fide* purchase from a person supposed to have a legal right and title and a possession of thirty years thereunder not being within this issue. The legislation that applies to this subject is section 16 of the act of 1874 (*Gen. Stat., p.* 1977), which was section 9 of the act of February 7th, 1799 (*Rev. L., p.* 411). Neither of these sections—sections 1 and 2 of the act of 1787 and section 9 of the act of 1799—conflicts with or modifies the other. If the case presented is within the first section of the act of 1787 or within the second section, or within section 9 of the act of 1799, a party may avail himself of the rights conferred by this legislation respectively and severally. In *Den, ex dem. West,* v. *Pine,* 4 *Wash.* (*U. S.*) 691, 695, Mr. Justice Washington remarks that there is no express repealing clause in the act of 1799 of the preceding act of 1787, nor such repugnance as would operate as a repeal by implication. "The length of possession prescribed by the first act is thirty years, and by the latter twenty. But by the former this possession will not avail the defendant unless it was commenced or was founded on a proprietary right, &c., or was obtained by a *bona fide* purchase of the land of some person in possession and supposed to have a legal title thereto. * * * The act of 1799 is entirely of a different character. It is unimportant under that act whether the defendant, or the person under whom he claims, entered into the possession under an apparent title or tortiously, and the limitation is arrested in its progress by any subsequent disability, the duration of which forms no part of the computation of time. Here, then, are two acts of limitation applying to two different subjects,

neither of which conflicts with the other, but both are open to the defendant, so that if either suits his case and is sufficien to defend his possession he is at liberty to avail himself of it, although the facts of his case may exclude him from the benefit of the other. What greater repugnance is there between the second section of the former and the ninth section of the latter act than between the first two sections of the former, the one making sixty and the other thirty years of uninterrupted possession equivalent to a valid title to the land? I confess I can perceive none. But what strongly shows that the act of 1787 has never been considered by the legislature any more than by the profession as having been repealed by the act of 1799 is that in all the revisals of the laws the two acts have been incorporated."

This leads to a consideration of the ninth section of the act of 1799, now the sixteenth section of the act of 1874. *Gen. Stat.*, *p.* 1977, § 23. Does possession in compliance with that section confer title or a mere right to bring an action in ejectment? The defendant took possession in 1891 and was in possession when this suit was brought. In this situation the contention is that although Gildersleeve and those succeeding to his title may have been in adverse possession for twenty years prior to 1891, yet the right to maintain this action was lost by the entry of the company and its peaceable possession from 1891 to 1895. On the other hand, the contention of the plaintiff is that by adverse possession for a period of twenty years prior to 1891, the plaintiff acquired a title which was not divested by the defendant's entry and subsequent possession. The section now under consideration was adopted from a part of the first section of 21 *Jac.* 1, *c.* 16. That section in the English statute is usually divided into four subdivisions, the fourth of which is "that no person or persons shall at any time hereafter make any entry into any lands, tenements or hereditaments but within twenty years next after his right or title which shall hereafter first descend or accrue to the same, and in default thereof such persons so not entering and their heirs shall be utterly excluded

and disabled from such entry after to be made, any former law or statute to the contrary notwithstanding." Except in verbiage section 9 of the act of 1799 is substantially the same as .the part of the English statute above quoted. Entry except within twenty years next after right or title shall accrue is prohibited in both sections, and persons not entering within twenty years are barred from entry afterwards.

In *Stokes* v. *Berry*, 2 *Salk.* 421, it was held that "if A has had possession of lands for twenty years without interruption, and then B gets possession, upon which A is put to his ejectment, though A is plaintiff, yet the possession of twenty years shall be a good title in him as if he had still been in possession." The same case is reported under the name of *Stocker* v. *Berny*, 1 *Ld. Raym.* 741. The report in the last . citation is as follows: "If H. has possession of land for twenty years uninterrupted, and then B. gains possession, upon which H. brings ejectment, though H. is plaintiff, yet his possession for twenty years will be a good title for him as well as if H. had been then in possession, because possession for twenty years now, by virtue of the statute 21 *Jac.* 1, *c.* 16, § 1, is like a descent at common law which tolls the entry." Other cases to the effect that possession adversely for twenty years is evidence of a title sufficient not only to defend but to maintain ejectment under the statute of *Jac.* 1, are cited by Mr. Finlason in his note to 3 *Reeves' Hist. Eng. L.* 310. *Ballan. Lim.* 23; 6 *Bac. Abr.* 369, *tit. " Limitations of Actions" B.* "An uninterrupted possession for twenty years not only gives a right of possession which cannot be divested by entry, but also gives a right of entry; so that if. a person who has such possession is turned out of it he may lawfully enter and bring an ejectment for its recovery, upon which he will be entitled to judgment. Thus a possession for twenty years in this case forms a positive prescription." 3 *Cruise Dig.* 436, ¶ 21.

In *Sedgwick & Waite on the Trial of Title to Land,* after discussing the theory on which statutes of limitation rested, the effect of possession in conformity with the statute is stated

as follows: "Though the prime object of these statutes may be the destruction of the right of re-entry, the necessary result and legal effect is the establishment of the exclusive adverse rights of him through whose possession the right to assert a paramount title has been extinguished and the vesting in him of the only title to the land." *Sedgw. & W. Trial Tit. Land,* § 727. The decisions of the courts of this state have uniformly recognized the doctrine which was applied in the construction of the statute of *Jac.* 1, from which our statute was drafted, and a possession adverse for twenty years held to be title by adverse possession—an actual title as distinguished from a mere right of entry. *Thorpe* v. *Corwin, Spenc.* 311; *Cornelius* v. *Giberson,* 1 *Dutcher* 1, 33; *Foulke* v. *Bond,* 12 *Vroom* 527, 541. The courts of this state, also, in deciding upon the effect of prescription as conferring a right to an easement which is not within the statute of limitations, but with respect to which twenty years' adverse enjoyment has been adopted in analogy with the statute of limitations as raising a presumption of grant, have held that the presumption arising from an adverse use for twenty years is an irrebuttable presumption and confers a right which is equivalent to title in corporeal hereditaments. *Lehigh Valley Railroad Co.* v. *McFarlan,* 14 *Vroom* 605, 621; *Cooper* v. *Carlisle,* 4 *C. E. Gr.* 256; *Yard* v. *Ocean Beach Association,* 4 *Dick. Ch. Rep.* 306, 309.

There was in this case a possession that must, in view of the verdict of the jury, be regarded as adverse for more than twenty years before the company erected its fence in 1891. The entry of the defendant at that time, in the face of such an adverse possession, was forbidden by the statute, and would neither give the defendant title nor bar the plaintiff from the title which had accrued in virtue of that possession prior to the company's entry.

In considering the effect of the statute of limitations no reference has been made to the disabilities which affect the running of the statute. No question of that kind arises in this case. We simply decide that adverse possession under our statute for the period of twenty years confers title by

adverse possession, which is not lost by the re-entry of the adverse claimant and his possession short of twenty years, which would give him a new title.

A question of more importance remains to be considered. The defendant's counsel insists that the doctrine of adverse possession is not applicable to the company with respect to the property in suit. This contention rests on the fact that the property was granted to the company for use for the purposes of its franchises. Hence, the argument is that, although the plaintiff and those with whom he is in privity of estate may have been in possession of the property in suit for the period of twenty years, under circumstances that would otherwise amount to an adverse possession, the defendant still had the right to enter and take possession whenever the exercise of its franchises required the use of the premises. Cases are cited which hold that no length of time will justify an encroachment upon streets or public highways. These cases do not touch the question now before the court. Streets and highways are vested in the public authorities for purposes that are exclusively public—a purely public right with no semblance of private ownership, and lands so appropriated to public use are absolutely inalienable. The possession by a railroad company of its roadbed is the possession by a corporation as its private property to enable it to perform a public duty.

In *Illinois Central Railroad Co.* v. *O'Connor,* 39 *N. E. Rep.* 563, the Supreme Court of Illinois held that the exclusive adverse possession for twenty years by a farmer, as part of his farm, of a strip of land adjoining a railroad track was a complete bar to the assertion by the railroad company of an easement in such strip. In that case the right of way granted to the railroad company was of land of the width of two hundred feet, " to have and to hold for all lawful uses and purposes incident to a full and indefeasible title in fee-simple or in any way connected with the construction, preservation, occupation and sole enjoyment of the said railroad and lands of the width aforesaid." The condition was that the company

should erect and maintain such lawful fences as would divide the land occupied by the company from the adjoining land on each side, and the company, shortly after the execution of this deed, erected a substantial post-and-rail fence fifty feet from the centre of its main track on each side, so that the fences enclosed land of the width of one hundred and fifty feet on either side, leaving the strip of land in controversy outside its fences. The point was unsuccessfully raised that the statute of limitations did not run against the company because of its right of way being but an easement, the fee remaining in its grantor and its subsequent grantee, who had a lawful right to the possession and use of the land consistent to the company's exercise of its right of easement, there, therefore, could be no hostile or adverse occupancy against the railroad company. This decision was affirmed in *Illinois Central Railroad Co.* v. *Moore*, 43 *N. E. Rep.* 364. The doctrine laid down in that case is that while mere non-user of all or part of a railroad location or right of way will not defeat or impair the right, yet the adjoining landowner or the owner of the fee may obtain title or regain title by an adverse use or occupancy for the requisite statutory period, where the conduct of the company has been such as to indicate its intention to abandon the whole or part of the location or right of way. In *Union Pacific Railway Co.* v. *Kindred*, 23 *Pac. Rep.* 112, the Supreme Court of Kansas held that possession of adjoining landowners of part of a right of way granted by congress as an easement to a railroad company must be regarded as permissive only, and not hostile or adverse, so as to confer title. But it will be perceived that the court in that case rested its decision on the principle that the fee of the land belonged to the United States, and that, as against the federal government, landowners could acquire no title by possession or limitation.

In Massachusetts there is a statute which provides " that if the owner or occupant of any land adjoining any railroad has taken or shall take into his enclosure any part of the land belonging to such railroad as located and established,

\* \* \* or has occupied or shall occupy for cultivation or otherwise any land belonging to or included within the location of such railroad, no continuance of such enclosure, &c., or occupancy of land belonging to such railroad shall create in the owner or occupant any right to the land belonging to such railroad so enclosed or occupied." In the construction of this statute the courts of Massachusetts have held that neither this statute nor the act that imposes a penalty on any person who knowingly stands or walks on a railroad track, will prevent the acquisition, by adverse use for twenty years, of a private way across a railroad. *Fisher* v. *New York and New England Railroad Co.*, 135 *Mass.* 107; *Gay* v. *Boston and Albany Railroad Co.*, 141 *Id.* 407; *Deerfield* v. *Connecticut River Railroad Co.*, 144 *Id.* 325, 336; *Fitchburg Railroad Co.* v. *Frost*, 147 *Id.* 118; *Turner* v. *Fitchburg Railroad Co.*, 145 *Id.* 433, 435. In *Litttefield* v. *Boston and Albany Railroad Co.*, 146 *Mass.* 268, it was held that title was gained by adverse possession to land adjoining a railroad which had been occupied openly, adversely and exclusively from 1852 to 1880, although the railroad company claimed an equitable right to it, but did not take actual possession until the latter year. The company entered in 1880 and the writ of entry was not brought until 1884.

The English decisions are to the same effect. In *Norton* v. *L. & N. W. Railway Co.*, *L. R.*, 9 *Ch. Div.* 623, land was conveyed to the company in fee-simple in 1833. In 1860 the grantee demised the premises to the plaintiff for ninety-nine years and the plaintiff had the enjoyment of the same, unquestioned by the railway company, until 1874. The suit was for damages for a nuisance by emitting smoke from the company's locomotive. It appeared that after the company took title it erected a hedge along its property, and outside of the hedge made a ditch. The railway company, by way of counter-claim, contended that the plaintiff was not entitled to the land on which his building was erected, but that the company was entitled to the strip between the hedge and the ditch. The plaintiff, among other things, contended that

the strip of land in controversy had been abandoned by the company and that the plaintiff was entitled to it up to the hedge, either as superfluous land or, under the statute of limitations, by reason of adverse possession. This contention was sustained by Vice Chancellor Malins in the Chancery Court, and his decision was affirmed in the Court of Appeals. 13 *Ch. Div.* 268. In the Court of Appeals it was expressly held that the owner of the rest of the field (in which this strip was enclosed) had had such a possession of the strip as was sufficient to extinguish the title of the company under the statute of limitations. In a later case in the Queen's Bench (*Bobbett* v. *S. E. Railway Co., L. R.,* 9 *Q. B. Div.* 424) it was held that the mere fact that land of a railway company is required for the purpose of its undertaking, and is not superfluous land, does not prevent an occupier who has exclusive possession for the period prescribed by the statute of limitations becoming thereby entitled to the land by virtue of the statute. The judgment in that case was for the company, on the ground that the land in controversy was so immediately adjoining its station, and so close to the existing siding and line, and so situated with reference to the boundaries of the company's premises, that it was, to the last degree, improbable that the company should have intended to put the plaintiff into sole and uncontrolled possession.

There is a line of cases holding that property acquired by a railroad company and held in good faith for future needs has incidents of property devoted to public use, although not actually in use for the company's business. Thus, where a company, having in its charter an exemption from taxation, has not completed its road and is engaged in the work of construction, the exemption will extend to property not actually used for other purposes, which has been acquired as the means of carrying into effect the objects of the charter, and is fairly within the plan upon which the work is being executed, and will be necessary for the business of the company when its contemplated improvements are completed. · *State, Morris and Essex Railroad Co.* v. *Haight,* 6 *Vroom* 41. So, also, the

English courts, in the construction of that section of the Lands Consolidation act which vests in adjoining owners, as superfluous lands, lands not used within ten years from the time fixed for the completion of the road for the purposes of the company's railroad, have held that it does not apply to lands which the company, merely because of insufficiency of traffic or want of funds, does not apply to its purposes, although in the meantime it is let out to yearly tenants and applied to uses for which it is in its then condition suitable. In cases of this sort, title by adverse possession is in no sense involved. The English as well as the American cases recognize the application of the statute of limitations and the doctrine of adverse possession as against the title of these companies in lands for which they have acquired title for corporate purposes.

But the plaintiff, to establish his title, does not rely exclusively on the statute of limitations.

The grant from Ezra Gildersleeve to the railroad company relates to two parcels of land, the one situated in the township of Clinton, the other in the township of Orange. The deed recites that the company had surveyed its route for a railroad, which route had been laid over the following described tract of land of the said Ezra Gildersleeve, situate in the townships of Clinton and Orange, in the county of Essex. The first parcel is described by courses and distances, referring to the centre stakes of the location of the track, "so as to include a strip of land one rod and a half wide on both sides of the centre stakes." This description of this part of the premises is a definite description of a strip of land one rod and a half on each side of the centre line. The strip comprised in this description, which is the strip through the first parcel, may be said to be fixed with precision. The description of the strip of land through the second parcel, which is that which is now in controversy, is indefinite. The reference to the centre stakes of the road, with courses and distances, indicates a location longitudinally, which is without a precise designation of width. The language in that respect is, "so

as to include a strip of land not exceeding two rods wide on each side of the centre stakes, through any of the lands of the said E. G., in the township of Orange." Nowhere in the deed, down to and including the description, are there any words of grant. The description is simply of the parcels of land over which the company had located its route. Then follow the operative words of grant, in these words: " Grant, bargain, sell, convey and confirm unto the said The Morris and Essex Railroad Company, and to their successors forever, the *right, liberty and privilege of entering upon the said tract of land above described* by its officers, agents, * * * and to take possession of, hold, have, use, occupy and excavate the same, and to erect embankments, bridges and all other works necessary to lay rails, and to do all other things which shall be suitable or necessary for the completion or repair of said road or roads." The grant is not of an unqualified fee, vesting title immediately on the execution of the deed, but of a right to enter, take possession and construct a railroad analogous to a license on a good consideration, and therefore irrevocable, which would confer title when and as it may be executed. It is clear that if the company had never gone farther, and had never constructed its railroad, the title of the grantor would not have been divested by force of this deed.

Another circumstance of great weight in the decision of this question is the fact that the *locus in quo*, on which the company was authorized to enter, take possession and build its railroad, was not fixed by precise boundaries. The company was authorized to enter, take possession and construct its railroad on this part of the grantor's premises, not to exceed two rods wide on each side of the centre stakes. It laid one track on the property, in 1835, and operated it as a single-track railroad. Shortly after or during the construction of that track, the fences referred to were erected at a distance of one rod and a half from the centre line. For a period of fifty-six years the grant to the company, indefinite in terms as to width, was located on the ground as of the width of three rods, as the boundaries were indicated by fences.

The property for which the plaintiff has title fronts on two parallel streets which cross the railroad, the side lines whereof adjoin the company's property. The location of these side lines is made uncertain by reason of the fact that the width of the company's route was not fixed by monuments or exact measurements. The general doctrine of the law is that where the true location of premises conveyed by a deed is doubtful, a practical location by consent of the parties will aid in the construction of the deed, and in some instances be conclusive as to the boundaries thus fixed, although the acquiescence be for a less period than twenty years. *Stone* v. *Clark*, 1 *Metc.* 378; *Den* v. *Van Houten*, 2 *Zab.* 62; *Jackson* v. *Perrine*, 6 *Vroom* 137; *Horner* v. *Stillwell, Id.* 307. There were no improvements made upon this property by those who took title under the Gildersleeves, and there was nothing but a possession such as conforms to the statute of limitations to affect the company's title. In view of the use for which the grant to the company was made, and the fact that the company was authorized by its charter, whenever its business or convenience required it, to occupy for a roadbed the full width of four rods, we think that the company would not be concluded by its election in the first instance to occupy only three rods. But that is not the question in this case. The company, under the form of this grant, could acquire no actual title except by an entry. When the occupation of the abutting owner continued adversely for the time which by law conferred title, the situation was changed and the company could not set up its rights under its charter to overcome a title which the plaintiff and those under whom he is in privity of estate acquired by adverse possession. By such possession adversely held for the period prescribed by the statute of limitations the company was debarred from entry and an indefeasible title became vested in the plaintiff. The company's entry in 1891 was therefore unlawful and tortious and incapable of being made the foundation of any title or right of possession.

A certificate will be made in compliance with this opinion.